# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

|  |  |  |
|---|---|---|
| PLANNED PARENTHOOD CENTER FOR CHOICE, et al., | § § § | |
| Plaintiffs, | § § | Civil Action No. 1:20-cv-00323-LY |
| v. | § § | |
| GREG ABBOTT, et al., | § § | |
| Defendants. | § § | |

---

## STATE DEFENDANTS'[1] RESPONSE TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER

---

[1] Defendants Greg Abbott, in his official capacity as Governor of Texas, Ken Paxton, in his official capacity as Attorney General of Texas, Phil Wilson, in his official capacity as Acting Executive Commissioner of the Texas Health and Human Services Commission, Stephen Brint Carlton, in his official capacity as Executive Director of the Texas Medical Board, and Katherine A. Thomas, in her official capacity as the Executive Director of the Texas Board of Nursing (collectively "State Defendants").

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS..................................................................................... 1

INTRODUCTION ............................................................................................. 3

STATEMENT OF FACTS ................................................................................. 5

    A.   The COVID-19 Pandemic Presents the Gravest Public Health
         Emergency to Texas in Over a Century.......................................................... 5

        1.   Absent extraordinary measures, the Texas healthcare system
              could face the same systemic collapse now unfolding in other
              places. .................................................................................................. 6

        2.   Health systems in New York and Louisiana stand on the brink
              of collapse.......................................................................................... 7

    B.   Texas Takes Extraordinary Measures to Prepare for a Surge of
         COVID-19 Infections. .................................................................................. 9

        1.   Governor Abbott issues EO GA-09 to ensure the survival of
              Texas healthcare. ............................................................................. 10

        2.   EO GA-09 imposes a blanket ban on medical procedures that are
              not medically necessary to preserve needed resources........................ 11

LEGAL STANDARD........................................................................................ 12

ARGUMENT ................................................................................................... 13

I.   The Court Should Deny the Motion for Temporary Restraining Order............ 13

    A.   Plaintiffs Have No Likelihood of Success on the Merits. ............................. 13

        1.   EO GA-09 applies to all physicians and clinics, including
              Plaintiffs. ........................................................................................ 13

            a.   Elective abortions are not "immediately medically
                 necessary" ................................................................................ 13

            b.   Surgical abortions use valuable PPE. ........................................... 14

            c.   Abortions may result in complications, which will impact
                 hospitals. .................................................................................. 15

            d.   Medication abortions are a "procedure" within the scope
                 of EO GA-09.............................................................................. 15

             e.   Abortion clinics may contribute to the spread of COVID-
                 19 by remaining open. ................................................................ 18

        2.   EO GA-09 is a valid exercise of state power. ......................................... 19

            a.   Longstanding precedent permits States to exercise their
                 police power in an emergency to protect public health.................. 19

          b.    Individual rights, including abortion, may be temporarily curtailed in a time of emergency. .................................................... 20

          c.    The *Casey* standard does not categorically exempt abortion from any curtailment for any reason, even pre-viability. ................................................................................... 23

     3.    EO GA-09 is Not An Unconstitutional Undue Burden. ....................... 25

          a.    EO GA-09 imposes no greater burden on women seeking abortions in the next three weeks than it does on other people seeking surgeries or procedures. ........................... 25

          b.    The benefits of EO GA-09 are compelling. .................................... 28

  B.    Plaintiffs Cannot Satisfy the Other Elements Necessary for a Temporary Restraining Order. ....................................................................... 31

II.    Numerous Jurisdictional Defects Bar Any TRO. ................................................. 33

  A.    Plaintiffs' claims against the Governor and the Attorney General are barred by sovereign immunity and Plaintiffs' lack of standing. ........... 33

     1.    The *Ex parte Young* doctrine does not allow suit against the Governor and Attorney General, who do not have independent authority to enforce the Executive Order. .............................................. 33

     2.    Plaintiffs lack article III standing to sue the Governor and Attorney General because, as to these defendants, Plaintiffs have not alleged injury in fact or redressability. ................................... 35

  B.    Plaintiffs lack third-party standing to challenge EO GA-09 on behalf of their unidentified patients. ............................................................. 37

  C.    The Court lacks jurisdiction to opine on the meaning of state law under *Pennhurst*. ........................................................................................... 39

  D.    The *Pullman* abstention doctrine prohibits the Court from issuing a TRO. ............................................................................................................ 39

CONCLUSION .................................................................................................................... 40

CERTIFICATE OF FILING AND SERVICE ......................................................... 42

## INTRODUCTION

The State of Texas faces its worst public health emergency in over a century. Never in our lifetimes have so many Texans been threatened with severe illness or death due to a pandemic sweeping the globe. The novel coronavirus ("COVID-19") infections has turned New York City hospitals into triage wards operating under battlefield conditions as doctors make life-or-death decisions about which intensive-care patients will receive a ventilator and which will die. Absent extraordinary measures, Texas will soon face a similar landscape.

Against that backdrop, Governor Abbott swiftly implemented emergency measures to protect our communities, hospitals, healthcare providers, and patients. Executive Order GA-09 orders every single physician and health clinic in the State to temporarily refrain from performing any medical procedure that is not "immediately medically necessary." DX-4 (EO GA-09). This Executive Order will save countless lives by preventing further spread of the disease by unnecessary contact and ensuring the conservation of personal protective equipment ("PPE") and hospital capacity necessary to protect the healthcare professionals who will save Texans from this disease.

But Plaintiffs—a collection of abortion clinics and one abortionist physician—ask this Court to grant them a special exemption, claiming a right to deplete or endanger precious PPE resources and hospital capacity in the name of providing abortions. They have no right to special treatment. After all, "the law need not give abortion doctors unfettered choice in the course of their medical practice, nor should it elevate their status above other physicians in the medical community." *Gonzales v. Carhart*, 550 U.S. 124, 163 (2007).

The State's efforts to stop the spread of COVID-19 are far-reaching precisely because COVID-19 presents a grave threat to public health. Because of the COVID-19

pandemic, counties in Texas and elsewhere have closed all but the most essential businesses and ordered residents to shelter-in-place. Throughout the country, millions of people lost their livelihoods almost overnight. Churches may no longer gather for worship services, groups of more than 10 people may no longer assemble (for expressive purposes or even private gatherings), schools and universities have closed, and people may no longer visit loved ones in nursing homes or assisted care facilities.

These measures are no doubt inconvenient in many cases, and catastrophic in others. They undoubtedly restrict Texans' freedom to carry on our lives as we normally would. But they are necessary. Government authorities expect a surge of COVID-19 cases in the very near future, and Texas is trying to ensure that we have adequate medical supplies, hospital capacity, and healthcare workers to prevent the system from collapsing. That happened already in Italy, and the situation is very grim in New York City and New Orleans. Every person affected by these temporary measures could argue that his individual actions won't spread the virus, so his individual noncompliance won't have a negative effect on public health. But the rules must apply to *all* to protect us *all*.

The Court should deny the motion for temporary restraining order for five reasons: (1) plaintiffs cannot establish a likelihood of success on the merits of their claims because they are being treated exactly like every other physician and clinic in the State of Texas during a national emergency, and the right to abortion does not have preeminence over all of the other individual liberties that are being temporarily curtailed; (2) plaintiffs fail to allege irreparable harm because they have not alleged that even a single patient will not be able to receive an abortion after the expiration of EO GA-09 in three weeks; and (3) the balance of the equities weighs in the State's favor

because the critical need to protect public health justifies this temporary order; (4) preserving across-the-board application of EO GA-09 is overwhelmingly in the public's interest; (5) and the Court cannot issue a TRO in any event because it lacks jurisdiction.

## STATEMENT OF FACTS

### A.  The COVID-19 Pandemic Presents the Gravest Public Health Emergency to Texas in Over a Century.

The spread of COVID-19, the disease caused by the novel coronavirus known as SARS-CoV-2, has become a global pandemic. Thompson Decl. ¶ 3 (DX-8). As of March 29, the virus has infected 721,584 people around the world and killed 33,958.[2]  There are currently 124,686 cases in the United States and that number continues to grow exponentially.[3] After an Imperial College of London study predicted high fatalities in the United States without decisive action, the White House issued sweeping new recommendations on March 16, 2020, including that people not gather in groups of more than 10.[4] Epidemic modeling estimates on the impact of the virus are dire. One of the authors of the Imperial College of London study stated:

> We estimate that the world faces an unprecedented acute public health emergency in the coming weeks and months. Our findings suggest that all countries face a choice between intensive and costly measures to suppress transmission or risk health systems becoming rapidly overwhelmed. However, our

---

[2] Coronavirus COVID-19 Global Cases by the Center for Systems Science and Engineering (CSSE) at Johns Hopkins University (JHU), https://gisanddata.maps.arcgis .com/apps/opsdashboard/index.html#/bda7594740fd40299423467b48e9ecf6.
[3] *Id.*
[4] Sheri Fink, *White House Takes New Line After Dire Report On Death Toll*, (N.Y. Times, Mar. 16, 2020), https://www.nytimes.com/2020/03/16/us/coronavirus-fatality-rate-white-house.html.

results highlight that rapid, decisive and collective action now will save mil-
lions of lives in the next year.[5]

> 1. **Absent extraordinary measures, the Texas healthcare system
>    could face the same systemic collapse now unfolding in other
>    places.**

A very serious concern is that the healthcare system will collapse from the sud-

den influx of very ill patients. Italy was hit hard by the virus in early March. Within

a few weeks, its healthcare system was on the brink of collapse, with doctors having

to ration care based on which patients were more likely to survive.[6] In only a "matter

of days, the system was being felled by a virus that . . . Italians[] had failed to take

seriously."[7] A group of Italian physicians wrote last week in the New England Journal

of Medicine that the outbreak is "out of control":[8]

> Our own hospital is highly contaminated, and we are far beyond the tipping
> point: 300 beds out of 900 are occupied by Covid-19 patients. Fully 70% of
> ICU beds in our hospital are reserved for critically ill Covid-19 patients with
> a reasonable chance to survive. The situation here is dismal as we operate
> well below our normal standard of care. Wait times for an intensive care bed
> are hours long. Older patients are not being resuscitated and die alone with-
> out appropriate palliative care, while the family is notified over the phone
> . . . . Most hospitals are overcrowded, nearing collapse while medications,
> mechanical ventilators, oxygen, and personal protective equipment are not
> available. Patients lay on floor mattresses. The health care system struggles
> to deliver regular services — even pregnancy care and child delivery — while

---

[5] Ryan O'Hare, *Coronavirus Pandemic Could Have Caused 40 Million Deaths If Left
Unchecked*, https://www.imperial.ac.uk/news/196496/coronavirus-pandemic-could-
have-caused-40/.

[6] Mattia Ferraresi, *A Coronavirus Cautionary Tale From Italy: Don't Do What We
Did*, (Boston Globe, Mar. 13, 2020), https://www.bostonglobe.com/2020/03/13/opin-
ion/coronavirus-cautionary-tale-italy-dont-do-what-we-did/.

[7] *Id.*

[8] Mirco Nacoti, et al, *At the Epicenter of the Covid-19 Pandemic and Humanitarian
Crises in Italy: Changing Perspectives on Preparation and Mitigation*, NEJM Cata-
lyst: Innovations in Care Delivery, Mar. 22, 2020), https://catalyst.nejm.org/
doi/full/10.1056/CAT.20.0080.

cemeteries are overwhelmed, which will create another public health problem.[9]

### 2. Health systems in New York and Louisiana stand on the brink of collapse.

There are signs of similar strain beginning to show in the United States. New York City is one of the epicenters of the disease. Footage of overflowing emergency rooms in New York is sobering.[10] On March 27, New York City had 21,873 COVID-19 infections, 281 deaths, and at least 3,900 hospitalized.[11] One day later, on March 28, it was reporting 30,765 infections.[12] On March 29, 2020, 33,474 cases are reported.[13] At one hospital in Queens, thirteen people died in a single day.[14] Temporary morgues have been pieced together using refrigerated trucks, while medical staff lack adequate PPE and are putting themselves in harm's way to care for the sick.[15]

> Several doctors, nurses and paramedics told The Associated Press of deteriorating working conditions in emergency rooms and ICUs that make caretakers even more vulnerable. Sick patients are placed in beds packed end-to-end. Limited supplies of face masks, gowns and shields have them wearing the same protective equipment all day. A lack of available ventilators could soon put doctors and nurses in the agonizing position of prioritizing who gets them and who does not.[16]

---

[9] *Id.*

[10] *See* Bernard Condon, Jim Mustian, and Jennifer Peltz, *Video Shows New York City Emergency Room Overflowing With Patients as City on Frontlines of Coronavirus Outbreak*, (Associated Press, Mar. 28, 2020), https://abc7ny.com/jamaica-hospital-queens-new-york-city-nyc-coronavirus/6058195/.

[11] *Id.*

[12] Coronavirus Disease Daily Data Study, https://www1.nyc.gov/assets/doh/downloads/pdf/imm/covid-19-daily-data-summary.pdf.

[13] *Id.*

[14] *Id.*

[15] *See* Condon, *supra* note 11 ("A nurse died from coronavirus after working nonstop for weeks at a hospital where staffers frustrated with dwindling supplies posed in gowns made of trash bags.")

[16] *Id.*; Patrick Madden, Ashley Dean, *New Orleans Officials Point to Increasing*

Closer to Texas (and specifically the Houston metropolitan area), New Orleans is another growing epicenter. In Louisiana, Orleans Parish has the highest COVID-19 death rate per capita in the nation.[17] On March 22, Louisiana Governor Edwards issued a statewide "stay at home" order, "citing fears that the Louisiana health care system could run out of capacity in as short a time as a week."[18] PPE shortage is a major concern, with Louisiana healthcare workers reporting "a lack of protective equipment amid a surge in new coronavirus cases in the region."[19] At one hospital in New Orleans, 60 employees have already tested positive for the virus and another 300 are quarantined. Marier Decl. ¶ 13 (DX-9). State health experts are projecting that during the first week of April, "there are going to be more sick patients in the greater New Orleans region than there are hospital beds to care for them."[20] One official described this as "absolutely frightening."[21] Another said, "This is a disaster that will define us for generations."[22]

---

*Spread of COVID-19 Cases,* https://www.npr.org/sections/coronavirus-live-updates/2020/03/27/822461580/new-orleans-officials-point-to-increasing-spread-of-covid-19-cases.

[17] Missy Wilkinson, *New Orleans ER Workers Say Hospitals Are Verging On 'Systemic Collapse,'* https://www.vice.com/en_us/article/7kzjby/covid-19-new-orleans-louisiana-hospitals-coronavirus-emergency.

[18] *Id.*

[19] Andrea Gallo, Blake Paterson and Matt Sledge, *Louisiana Nurses Face Start Choice Between Personal Protection, Coronavirus Patient Care,* https://www.nola.com/news/coronavirus/article_5ffada98-7071-11ea-9c12-0bbed00fccd5.html.

[20] Rosemary Westwood, *'This Is Absolutely Frightening': Louisiana Hospitals Brace For The Worst of COVID-19,* https://www.wwno.org/post/absolutely-frightening-louisiana-hospitals-brace-worst-covid-19.

[21] *Id.*

[22] Vann R. Newkirk II, *Watch New Orleans,* (The Atlantic, Mar. 27, 2020), https://www.theatlantic.com/politics/archive/2020/03/coronavirus-pandemic-coming-new-orleans/608821/.

### B. Texas Takes Extraordinary Measures to Prepare for a Surge of COVID-19 Infections.

COVID-19 has also spread to Texas. The number of cases in Texas has jumped 156% from just five days ago. *See* DX-3. An "exponential increase" in COVID-19 cases is expected over the next few days and weeks. Abraham Decl. ¶4 (DX-6). Such a drastic increase will pose serious threats to the ability of Texas's emergency healthcare system to continue providing effective care. *Id.* According to Dr. Heidi Abraham, the Associate EMS Medical Director for Austin/Travis County Emergency Medical Services, unless the infection rate can be slowed and PPE and hospital capacity preserved, emergency healthcare in Austin and Travis County is "in danger of becoming overburdened in a very short time." Abraham Decl. ¶ 9.

Texas law makes the Governor "responsible for meeting the dangers to the state and people presented by disasters." Tex. Gov't Code § 418.011. Governor Abbott declared a statewide disaster on March 13, 2020 pursuant to Texas Government Code section 418.014. DX-1. The Government Code grants the Governor broad authority once he has declared a disaster. In a disaster, the Governor may "suspend the provisions of any regulatory statute prescribing the procedures for conduct of state business or the orders or rules of a state agency if strict compliance with the provisions, orders, or rules would in any way prevent, hinder, or delay necessary action in coping with a disaster." *Id.* § 418.016. The Governor may even "commandeer or use any private property if the governor finds it necessary to cope with a disaster." *Id.* § 418.017(c). These powers are exercised by the Governor through the issuance of executive orders, proclamations, and regulations, which the Governor also has the power to amend or rescind. *Id.* at § 418.012. Executive orders, proclamations, and regulations "have the force and effect of law." *Id.*

On March 19, 2020, Dr. John Hellerstedt, Commissioner of the Department of State Health Services, declared a public health disaster under Texas Health and Safety Code section 81.082 because the virus "poses a high risk of death to a large number of people and creates a substantial risk of public exposure because of the disease's method of transmission and evidence that there is community spread in Texas." DX-2.

### 1. Governor Abbott issues EO GA-09 to ensure the survival of Texas healthcare.

Avoiding collapse requires the entire healthcare system to conserve resources. Abraham Decl. ¶¶ 8-9. But despite guidance "from the President's Coronavirus Task Force, the CDC, the U.S. Surgeon General, and the Centers for Medicare and Medicaid Services" to postpone elective procedures, "hospital capacity and personal protective equipment are being depleted by surgeries and procedures that are not medically necessary to correct a serious medical condition or to preserve the life of a patient." DX-4.[23]

The national shortage of PPE along with an increased need for it to deal with highly infectious patients is a major concern. Abraham Decl. ¶¶ 4-6. Many hospitals in Texas are critically short on supplies. After the disaster declaration, the State

---

[23] *See also* Jenny Gold, *Some Hospitals Continue With Elective Surgeries Despite COVID-19 Crisis*, (Kaiser Health News, Mar. 20, 2020), https://khn.org/news/some-hospitals-continue-with-elective-surgeries-despite-covid-19-crisis/ ("[E]xperts interviewed . . . found it troubling that hospitals would continue to perform elective surgeries in the face of the coronavirus threat, both because of the toll on scarce national supplies and because it puts staff and patients at unnecessary risk of exposure.")

Medical Operations Center had received 2,178 requests for PPE from health care facilities in Texas. Hoogheem Decl. ¶ 5 (DX-10).[24] One of North Texas's largest hospitals, Parkland, is in danger of running out of protective masks "in as little as three weeks, a drastic drop from normal times when the supply could last for three months."[25] At Anson General Hospital, north of Abilene, "the supply of N95 masks was down to 14 on Monday [March 23]."[26] At Goodall-Witcher Hospital, north of Waco, the hospital administrator "said he had read that between shift breaks and staffing changes, treating a single COVID-19 patient might require as many as 40 masks per day. On Monday [March 23], his 25-bed hospital had fewer than 75."[27]

### 2. EO GA-09 imposes a blanket ban on medical procedures that are not medically necessary to preserve needed resources.

Based on these concerns, on March 22, 2020, the Governor issued an executive order designed to increase the capacity of Texas's healthcare system to absorb a surge of COVID-19 patients and address the severe shortage of PPE. DX-4 (EO GA-09). The order applies to all licensed health care professionals and all licensed health care facilities in the State. It requires that they "postpone all surgeries and procedures that are not immediately necessary to correct a serious medical condition of, or to preserve the life of, a patient who without immediate performance of the surgery or

---

[24] To put this in perspective, Texas had 407 hospitals as of 2017. Laura Dyrda, *How Many Hospitals Does Each State Have?*, (Becker's Hosp. Rev., Feb. 2, 2017), https://www.beckershospitalreview.com/hospital-transactions-and-valuation/how-many-hospitals-does-each-state-have.html.

[25] Scott Friedman, Eva Parks, Jose Sanchez and Jack Douglas Jr., *Desperate to Keep Protective Gear in Stock, North Texas Nurses Told to Re-Use Face Masks*, https://www.nbcdfw.com/investigations/desperate-to-keep-protective-gear-in-stock-north-texas-nurses-told-to-re-use-face-masks/2337375/.

[26] Emma Platoff, *Texas Hospitals Brace for Coronavirus Surge With Uncertain Stocks of Protective Gear*, (Tex. Tribune, Mar. 25, 2020).

[27] *Id.*

procedure would be at risk for serious adverse medical consequences or death, as determined by the patient's physician." *Id.* It does not, however, apply to "any procedure that, if performed in accordance with the commonly accepted standard of clinical practice, would not deplete the hospital capacity or the personal protective equipment needed to cope with the COVID-19 disaster." *Id.* The Order is effective until April 21, 2020. *Id.* According to Dr. Robert Marier, Vice Chairman of Hospital Medicine for the Ochsner Health System and a board-certified infectious disease expert, this measure has a "sound basis," especially in light of the "risk of transmission in health care settings." Marier Decl. ¶ 14. According to Dr. Abraham, "uniform compliance" with EO GA-09 is "vital for the immediate safety of our community." Abraham Decl. ¶ 9.

## LEGAL STANDARD

A temporary restraining order is "an extraordinary remedy that should only issue if the movant shows: (1) a substantial likelihood of prevailing on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) the threatened injury outweighs any harm that will result to the non-movant if the injunction is granted; and (4) the injunction will not disserve the public interest." *Ridgely v. Fed. Emergency Mgmt. Agency*, 512 F.3d 727, 734 (5th Cir. 2008). "[T]he enormity of the relief is difficult to overstate." *Trinity USA Operating, LLC v. Barker*, 844 F. Supp. 2d 781, 785 (S.D. Miss. 2011) (citing Wright, Miller & Kane, *Federal Practice and Procedure*: Civil 2d § 2948 (noting that courts describe such requests as "drastic," "extraordinary," and the requesting party must make a "clear showing")). The Court should proceed with caution in this context, where the issuance of a TRO would have the effect of countermanding an executive order issued by the Governor to protect public safety in a national emergency.

# ARGUMENT

## I. The Court Should Deny the Motion for Temporary Restraining Order.

Plaintiffs have not satisfied any of the four requirements for a TRO.

### A. Plaintiffs Have No Likelihood of Success on the Merits.

#### 1. EO GA-09 applies to all physicians and clinics, including Plaintiffs.

The plain language of EO GA-09  temporarily curtails "surgeries and proce-dures,"  unless they are (1) "not immediately necessary to correct a serious medical condition of, or preserve the life of a patient," or (2) would not deplete hospital capac-ity or use needed PPE resources. Elective abortions—whether medical or surgical—do not meet either of these criteria and are therefore prohibited by EO GA-09. And according to Dr. Timothy Harstad, the perinatal medical director at St. David's Med-ical Center in Austin, "suspending elective abortion procedures would help preserve valuable PPE and hospital capacity." Harstad Decl. ¶5 (DX-7).

#### a. Elective abortions are not "immediately medically necessary"

Abortions are considered an elective procedure unless they are therapeutic, meaning performed for medical reasons. *See id.* ¶ 3, 5.  Therapeutic abortions are rare and are performed in hospitals, not abortion clinics. *Id.* ¶ 3. And "elective abor-tions are never 'immediately medically necessary.'" Thompson Decl. ¶ 5. Thus, under the plain text of EO GA-09, "abortion providers should not be exempted." *Id.* To the extent Plaintiff argue that they could somehow comply with EO GA-09 and still per-form elective abortions, Pls. Mot. TRO 12-13, they are mistaken.

Because the plain text shows otherwise, Plaintiff argue that abortion is "essential health care" and therefore should not be included in any measures taken to expand hospital capacity for COVID-19 cases, and that they should be able to use opinions of

industry groups to justify their decision to flout the law. Pls. Mot. TRO 12-13. The American College of Obstetricians and Gynecologists (ACOG) issued a statement opposing the categorization of abortion as a procedure that can be delayed during the COVID-19 pandemic, asserting that "abortion is an essential component of comprehensive health care." Pls. Mot. TRO 14. But 86% of OB/GYNS do not even perform abortions.[28] Regardless, EO GA-09 does not refer to "essential health care." Under the language of EO GA-09, elective abortions are not "immediately necessary," nor do they "correct a serious medical condition." *See also* Thompson Decl. ¶ 5; Harstad Decl. ¶5. Thus, EO GA-09 clearly prohibits the performance of elective abortions, like other elective procedures, for a limited period of time.

### b.   Surgical abortions use valuable PPE.

Plaintiff admit that they use PPE when performing surgical abortions. Compl. ¶ 54. They claim that they will try to use less in light of the shortage. Compl. ¶ 51. While that is admirable, the point of EO GA-09 is to preserve *all possible* PPE for the vital purpose of protecting healthcare workers on the front lines of fighting COVID-19—a measure that is essential to preventing a systemic collapse due to the spread of infection to those workers. Abraham Decl. ¶¶ 5-6, Hoogheem ¶ 3; *see also* Marier Decl. ¶ 6, 11-13. Plaintiffs' use of PPE for *any* non–medically necessary procedures is prohibited by EO GA-09.

---

[28] Debra Stulberg, et al., *Abortion Provision Among Obstetrician-Gynecologists*, Obstet. Gynecol. 2011 Sep; 118(3): 609–614, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3170127/.

### c. Abortions may result in complications, which will impact hospitals.

Plaintiffs admit that abortion complications occur and that they sometimes require hospitalization or treatment at an emergency room. Compl. ¶ 40. Planned Parenthood has conceded that at least 210 women each year in Texas are hospitalized after seeking an abortion. *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 748 F.3d 583, 595 (5th Cir. 2014). That is about four women every week. Using the rate Plaintiffs give for major complications, 0.23%, Compl. ¶ 40, that is two women every week. And because abortion doctors are not required to have admitting privileges at a nearby hospital, *see Hellerstedt*, 136 S. Ct. at 2299, they cannot admit and take care of their own patients. Instead, patients suffering complications are sent to an emergency room. Thus, aside from taking up needed beds in the midst of this pandemic, abortion patients will also further burden overtaxed emergency departments during a surge of COVID-19 cases. *See* Abraham ¶ 9.

### d. Medication abortions are a "procedure" within the scope of EO GA-09.

Plaintiffs argue that medication abortions are not a "procedure" within the meaning of the Order. The definition of "procedure" in the medical context is "a series of steps for doing something." *Miller-Keane Encyclopedia and Dictionary of Medicine, Nursing, and Allied Health* (7th ed. 2003). That encompasses medication abortion. According to the Texas Medical Board's FAQs, the term "procedure" under EO GA-09 excludes only "physical examinations, non-invasive diagnostic tests, the performing of lab tests, or obtaining specimens to perform laboratory tests."[29] And Plaintiffs

---

[29] *Texas Medical Board (TMB) Frequently Asked Questions (FAQs) Regarding Non-Urgent, Elective Surgeries and Procedures During Texas Disaster Declaration for*

themselves treat medication abortion as a "medical procedure."[30] Medication abortions frequently result in complications that require surgical intervention, and thus use PPE and impact hospital capacity, as discussed above.

 i. Undergoing a medication abortion is not like taking an aspirin. As Planned Parenthood states, "[t]he abortion pill process has several steps and includes two different medicines."[31] The procedure begins with the patient taking Mifepristone, which causes the fetus to die.[32] Because of "the risks of serious complications," Mifeprex is "available only through a restricted program under a Risk Evaluation and Mitigation Strategy (REMS) called the Mifeprex REMS Program."[33] A REMS "is a drug safety program that the U.S. Food and Drug Administration (FDA) can require for certain medications with serious safety concerns to help ensure the benefits of the medication outweigh its risks."[34]

 Between 24 and 48 hours later, the woman is instructed to take a second medi-

---

*COVID-19 Pandemic*, Mar. 29, 2020, http://www.tmb.state.tx.us/idl/228ABC7B-2985-16D5-9C9F-2099C0DADC24.

[30] Planned Parenthood Gulf Coast, *Disclosure and Consent Form for Medical, Surgical, and Diagnostic Procedures*, https://www.plannedparenthood.org/files/6114/0168/3065/C107e_Disclosure_and_Consent_for_Medical_Surgical_Diagnostic_ProcedureTexas.pdf.

[31] *See* Planned Parenthood, *How Does the Abortion Pill Work?*, https://www.plannedparenthood.org/learn/abortion/the-abortion-pill/how-does-the-abortion-pill-work.

[32] *See* Mifeprex Medication Guide 17, https://www.fda.gov/media/72923/download.

[33] Mifeprex label, https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/020687s020lbl.pdf.

[34] FDA, *Risk Evaluation and Mitigation Strategies*, https://www.fda.gov/drugs/drug-safety-and-availability/risk-evaluation-and-mitigation-strategies-rems.

cation, misoprostol, which causes her uterus to contract and expel the fetus and placenta.[35] Women experience bleeding and cramping during this process.[36] With some frequency, these drugs do not completely empty the uterus, which can result in a serious infection.[37] Thus, the provider is required to schedule a follow-up appointment with the patient to make sure that the abortion is complete.[38]

Before prescribing drugs to induce an abortion, Texas law requires a physician to examine the patient.  Texas law also requires that "the attending physician, advanced practice registered nurse, or physician assistant . . . obtain[] and document[] a pre-procedure history, physical exam, and laboratory studies, including verification of pregnancy." Tex. Health & Safety Code § 171.063(c).  This physical examination and interaction with staff will require some use of PPE such as gloves or masks, especially during a pandemic where close physical contact (like in the healthcare context) can result in virus transmission, and even asymptomatic people may transmit the virus. Marier Decl. ¶ 6; Abraham Decl. ¶.

ii.   It is possible the woman could end up in a hospital and divert COVID-19 resources as a result of a medication abortion.  Incomplete medication abortions are common. To even become certified to prescribe mifepristone, the FDA requires providers to agree that they have the "ability to provide surgical intervention in cases of incomplete abortion or severe bleeding, or to have made plans to provide such care through others, and ability to assure patient access to medical facilities equipped to

---

[35] *Id.*

[36] *Id.*

[37] *Id.*

[38] *Id.*; Tex. Health & Safety Code § 171.063(e)-(f); 25 Tex. Admin. Code 139.53(b)(4).

provide blood transfusions and resuscitation, if necessary."[39]   Mifeprex is currently approved for use up to 70 days (10 weeks) gestation.[40] But Mifeprex has an 8% incomplete abortion rate before 49 days (7 weeks) and a more than 15% incomplete abortion rate beyond that gestational age[41] There were 17,050 medication abortions in Texas in 2017, so about 328 per week. Assuming the lower 8% incomplete abortion rate, at least 26 women per week in Texas would require surgical intervention. The surgical procedure necessary to complete the abortion or stop the hemorraging will require PPE, and the patient may require hospitalization or a blood transfusion.[42] Thus, medication abortion risks impacting hospital resources just like other outpatient elective procedures that may  result in a complication or hospital visit, even if that is not typical.

### e.  Abortion clinics may contribute to the spread of COVID-19 by remaining open.

Aside from impacting PPE supplies and hospital capacity, *see* Harstad Decl. ¶ 5, Plaintiff' clinics can contribute to the spread of the virus by continuing to perform non-medically necessary procedures. Abraham ¶¶ 7-8. People infected with COVID-19 may infect others prior to the onset of symptoms, and even healthcare workers

---

[39] Mifeprex REMS, https://www.accessdata.fda.gov/drugsatfda_docs/rems/Mifepristone_2019_04_11_REMS_Document.pdf.

[40] Mifeprex Medication Guide 16, *supra*.note 34.

[41] Am. Coll. of Obstetricians and Gynecologists, *Medical Management of First-Trimester Abortion, Practice Bulletin 143* (2016), https://www.acog.org/clinical/clinical-guidance/practice-bulletin/articles/2014/03/medical-management-of-first-trimester-abortion.

[42] Blood supplies are critically low due to the pandemic. *See* Am. Red Cross, *American Red Cross Faces Severe Blood Shortage As Coronavirus Outbreak Threatens Availability of Nation's Supply*, https://www.redcross.org/about-us/news-and-events/press-release/2020/american-red-cross-faces-severe-blood-shortage-as-coronavirus-outbreak-threatens-availability-of-nations-supply.html.

wearing N95 masks cannot completely eliminate the risk of contracting the virus. Marier Decl. ¶¶ 6-8, 11-13; Abraham Decl. ¶ 4. Plaintiffs, however, admit they do not wear N95 masks, Pls. Mot. TRO 22, so they are at increased risk of becoming infected themselves and spreading the virus. Marier Decl. ¶¶ 11-13.Moreover, as Plaintiff state, women travel from other locations to receive abortions at their clinics, and traveling to other parts of the State is exactly what is causing the spread of the virus. *See* Compl. ¶ 72; Dewitt-Dick Decl. ¶ 22 ("Some [patients] come from over a hundred miles to receive care at our clinic."); Ferrigno Decl. ¶30 (patients "hail from all over Texas"). In 2017, there were 53,843 abortions performed in Texas. DX-5. That is over 1,000 abortions per week. That is a high volume of people traveling "all over" the State and coming through medical facilities, which risks spreading the illness further. *See* Abraham Decl. ¶7.

### 2.   EO GA-09 is a valid exercise of state power.

EO GA-09 is a proper exercise of the State's police power, and the right to an abortion recognized by precedent does not preempt public health measures taken in a time of emergency.

### a.   Longstanding precedent permits States to exercise their police power in an emergency to protect public health.

The Tenth Amendment reserves to the States all powers that are not given to the United States or otherwise prohibited by the Constitution. U.S. Const. Amend. X. This reservation of power includes the police power, which enables the State to act to protect public health. The Supreme Court has "distinctly recognized the authority of a state to enact quarantine laws and health laws of every description." *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 25 (1905). When faced with potential

epidemics or crises caused by infectious diseases, the Supreme Court has held repeat-edly that States may act to protect their citizens without violating the Constitution. *See id.* (upholding a mandatory vaccination program for small pox against a Four-teenth Amendment challenge); *Compagnie Francaise de Navigation a Vapeur v. Bd. of Health of State of La.*, 186 U.S. 380 (1902) (upholding quarantine law that pre-vented a ship from landing in New Orleans because of infectious disease there against Commerce Clause and procedural due process challenges); *Rasmussen v. State of Id.*, 181 U.S. 198 (1901) (upholding a law that permitted the Governor to ban certain sheep from being imported if evidence of disease was found against a Commerce Clause challenge); *see also, e.g.*, *Benson v. Walker*, 274 F. 622 (4th Cir. 1921) (uphold-ing board of health resolution that prevented carnivals and circuses from entering a certain county in response to the Spanish flu epidemic).

### b. Individual rights, including abortion, may be temporarily curtailed in a time of emergency.

1.   While the Constitution is not suspended during a national crisis, Supreme Court precedent allows for States trying to protect public health to take action that may restrict personal liberty to some degree:

> There is, of course, a sphere within which the individual may assert the su-premacy of his own will . . . But it is equally true that in every well-ordered society charged with the duty of conserving the safety of its members the rights of the individual in respect of his liberty may at times, under the pres-sure of great dangers, be subjected to such restraint, to be enforced by rea-sonable regulations, as the safety of the general public may demand.

*Jacobson*, 197 U.S. at 29.

> This is true for enumerated rights, like property rights:

> That a state, in a bona fide exercise of its police power, may interfere with private property, and even order its destruction. . . . For instance, meats, fruits, and vegetables do not cease to become private property by their decay;

but it is clearly within the power of the state to order their destruction in times of epidemic, or whenever they are so exposed as to be deleterious to the public health. . . . No property is more sacred than one's home, and yet a house may be pulled down or blown up by the public authorities, if necessary to avert or stay a general conflagration.

*Sentell v. New Orleans & C.R. Co.*, 166 U.S. 698, 704-05 (1897).

This is also true for substantive due process rights involving bodily or personal autonomy. For instance, the "liberty secured" by the Fourteenth Amendment includes the right to "'live and work where [one] will.'" *Jacobson*, 197 U.S. at 29 (quoting *Allgeyer v. Louisiana*, 165 U.S. 578 (1897)). Yet to protect the public against the spread of disease, a states may impose mandatory quarantine orders even as to individuals who are not sick themselves. *See id*. States may also require mandatory vaccinations, notwithstanding the Fourteenth Amendment. *See Jacobson*, 197 U.S. at 27-38; *see also Phillips v. City of N.Y.*, 775 F.3d 538 (2d Cir. 2015) (rejecting a substantive due process challenge to New York's vaccination requirement for public-school children, relying on *Jacobson*, 197 U.S. 11). There is no reason a non-enumerated right like abortion should receive greater preference or protection.

2.    Further, temporary curtailment in this context is not a denial of the right altogether. Take, for example, this Court's closure due to the danger of COVID-19. The Court has postponed criminal jury trials until May 1, 2020, a longer period than that at issue with EO GA-09.[43] Certainly, the Constitution expressly establishes the right to "speedy and public trial" by jury. U.S. Const. am. VI. But this Court evidently

---

[43] Order Regarding Court Operations Under the Exigent Circumstances Created By the COVID-19 Pandemic, (W.D. Tex. Mar. 13, 2020), https://www.txwd.uscourts.gov/wp-content/uploads/2020/03/Order-Re-COVID-19.pdf.

does not consider the temporary suspension of that right because of the "exigent cir-cumstances" presented by the "severity of the risk" of COVID-19 to "public health" to be an outright *denial* of the constitutional right to speedy trial by jury.[44] *Id.* The Court has limited its functions to only the most urgent matters, while postponing others, even though those matters are still important.[45] That is precisely what EO GA-09 does with medical procedures that are not "immediately medically necessary"; such procedures must be postponed until April 21, 2020, to prepare the healthcare system to absorb a sharp increase in COVID-19 cases.

Further, the right to vote is "the essence of a democratic society, and any re-strictions on that right strike at the heart of representative government." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964). It is also expressly protected by the Constitution. U.S. Const. am. XIV § 2, XV, XVII, XIX, XXIV. Yet the Ohio Supreme Court just rejected an effort to challenge the Ohio Department of Health's order postponing the State's March 17 primary election until June 2, 2020, due to public health concerns related to COVID-19.[46]

---

[44] The Court also suspended application of the Speedy Trial Act, 18 U.S .C. § 3161 (h)(7)(A), finding "that the ends of justice served by ordering these continuances out-weigh the best interests of the public and each defendant's right to a speedy trial. In fact, the best interests of the public are served by these continuances." *Id.*

[45] Additional Order Regarding Sentencing Hearings Under the Exigent Circum-stances Created By the COVID-19 Pandemic, (W.D. Tex. Mar. 24, 2020) (continuing all sentencings for which the presentence report calculates the bottom of the Guide-lines range as 21 months' imprisonment or more), https://www.txwd.uscourts.gov/wp-content/uploads/2020/03/Amended%20Order%20Re%20Court%20Opera-tions%20032420.pdf.

[46] *See State ex rel. Speweik v. Wood Cty. Bd. of Elections*, No. 2020-0382, 2020 WL 1270759 (Ohio Mar. 17, 2020); J. Edward Moreno, *Ohio Supreme Court Denies Chal-lenge to State Primary Delay* (The Hill Mar. 17, 2020), https://thehill.com/home-

* * *

EO GA-09's temporarily suspension of abortion procedures—like *all other proce-dures* that are not "immediately medically necessary" for reasons directly related to the public health—is not an outright denial of that right. Nor is it a de facto violation of the Constitution, given the legitimate exercise of the State's police power to protect public health in this emergency situation.

### c.  The *Casey* standard does not categorically exempt abortion from any curtailment for any reason, even pre-viability.

Plaintiffs' arguments completely fail to consider the State's police power to pro-tect the public health during a pandemic. Instead, they argue that abortion has spe-cial protection, notwithstanding clear authority allowing the State to take strong measures to protect the public health. They base this argument on *Planned Parenthood of Southeastern Pennsylvania v. Casey*'s holding that the State may not prohibit abortion before viability. 505 U.S. 833 (1992); Pls. Mot. TRO 17-20; *see also Jackson Women's Health Org. v. Dobbs*, 945 F.3d 265 (5th Cir. 2019).

But *Casey* did not insulate previability abortions from any incursion whatsoever, no matter how justified. Rather, *Casey* drew a line at viability because "viability marks the earliest point *at which the State's interest in fetal life* is constitutionally adequate to justify a legislative ban on nontherapeutic abortions." *Casey*, 505 U.S. at 860 (emphasis added). After viability, the Court reasoned, the State's interests in protecting the fetus's life are strong enough to support restriction because viability "is the time at which there is a realistic possibility of maintaining and nourishing a

_____

news/state-watch/487983-ohio-supreme-court-denies-challenge-to-state-primary-de-lay.

life outside the womb, so that the independent existence of the second life can in reason and all fairness be the object of state protection that now overrides the rights of the woman." *Id.* The State's interest in fetal life is not at issue here, but the State's interest in *everyone*'s life is. *Casey*, and consequently *Dobbs*, are simply not applicable to a situation like this one, nor do they purport to be.[47]

The Fifth Circuit recognizes that where the State has compelling interests, such as public health, it may take action that has the effect of completely restricting abortions without running afoul of the Constitution. In *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 457 (2014), the Fifth Circuit held that a law requiring admitting privileges for abortion doctors was unconstitutional because it would result in closing the sole abortion clinic in the state. The Court said that the closure would "effectively extinguish [the right to pre-viability abortion] within Mississippi's borders." *Id.* But the Fifth Circuit nevertheless clarified that it was not a *per se* undue burden for the State to apply health standards to close that sole clinic, even if it had the effect of banning abortions in the State: "Nothing in this opinion should be read to hold that any law or regulation that has the effect of closing all abortion clinics in a state would inevitably fail the undue burden analysis." *Id.* at 458.

This makes perfect sense. Obviously, if a clinic or doctor is endangering its patients, the State may close that clinic or suspend the doctor's license to practice medicine to protect the public, even if that clinic or doctor were the only one performing abortions in the State. In that circumstance, as here, the compelling interest of protecting public health justifies the resulting loss of abortion access.

---

[47] The same is true of the cases cited by plaintiffs striking down pre-viability abortion restrictions. Pls. Mot. TRO 18-19. None of the cited cases involve a law of general applicability enacted to preserve medical resources in a time of national crisis.

### 3.   EO GA-09 is Not An Unconstitutional Undue Burden.

Plaintiffs alternatively argue that if the undue burden test applies, EO GA-09 is unconstitutional under that standard. Pls. Mot. TRO 20-21. Under *Casey*, a law imposes an "undue burden" when it places "a substantial obstacle in the path of a woman seeking an abortion." 505 U.S. at 878. *Casey* made clear that "[n]ot all burdens on the right to decide whether to terminate a pregnancy will be undue." 505 U.S. at 876. Yet even if state regulation "increas[es] the cost or decreas[es] the availability," or makes it "more difficult or more expensive to procure an abortion," that "cannot be enough to invalidate it" *if the law serves a "valid purpose . . . not designed to strike at the right itself." Id.* at 874 (emphasis added). Rather, if a law amounts to a "substantial obstacle," the Court "consider the burdens a law imposes on abortion access together with the benefits those laws confer." *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2309 (2016).

### a.   EO GA-09 imposes no greater burden on women seeking abortions in the next three weeks than it does on other people seeking surgeries or procedures.

EO GA-09 imposes only a temporary burden on abortion access. For just three weeks, physicians and clinics are prohibited from performing abortion procedures unless the procedure is "immediately medically necessary" or if the procedure would not deplete the hospital capacity or PPE needed to cope with the COVID-19 disaster. DX-4.[48]  Delay of a few weeks for public health reasons does not amount to a total denial.

---

[48] Plaintiffs claim that EO GA-09 "could remain in effect for months." Pls. Mot. TRO at 21. That is speculation and should be disregarded. EO GA-09 expires on April 21, 2020, three weeks from now, and plaintiffs point to nothing to support their assertion that it would be indefinitely effective. Texas law authorizes the Governor to issue executive orders during a state of disaster, and states that a "state of disaster may not continue for more than 30 days unless renewed by the governor." Tex. Gov't Code § 418.014(c).

*See* Part I.A.2.b.2. *supra*; *see also Casey*, 505 U.S. at 886 (acknowledging mandatory waiting period may sometimes result in a delay of "much more than a day" but concluding that it was not an undue burden even if it increased costs and potential delays).

a.   EO GA-09 does not burden Plaintiff' patients more than anyone else. It applies to *every* physician and *every* clinic in the State of Texas, so it is obviously not "designed to strike at the right itself." *Casey*, 505 U.S. at 874. It also applies to *every* medical procedure—women seeking abortions are being treated no differently than anyone else seeking a medical procedure at this time. Many people across the State will not be able to have a desired surgery for the next three weeks because of the grave threat of COVID-19, which will unfortunately impose some hardship. Physicians have been postponing surgeries for cancer patients, for patients with heavy bleeding that can be controlled temporarily with medication, for orthopedic procedures, bariatric surgeries, and tubal ligations. Harstad Decl. ¶ 5, Thompson Decl. ¶ 4. All physicians at UT Southwestern Medical Center are restricted to performing surgery only in life-threatening cases. Thompson Decl. ¶ 4. Nationwide, stent procedures for clogged arteries, surgeries for breast, thyroid, prostate, and kidney cancer, mammograms, colonoscopies, and fertility treatments are being postponed because of the threat of COVID-19.[49]

A pandemic does not present ideal circumstances for anyone. The temporary burden on women seeking abortion is commensurate with—and arguably exceeded in some cases—by the burdens being placed on many other Texans seeking other types

---

[49] Marilynn Marchione, *Cancer, Heart Surgeries Delayed as Coronavirus Alters Care* (Associated Press Mar. 18, 2020), https://www.usnews.com/news/health-news/articles/2020-03-18/cancer-heart-surgeries-delayed-as-coronavirus-alters-care.

of procedures during this unprecedented disaster. The State took emergency action to do what it can to preserve limited medical resources in the next few weeks to prevent a complete breakdown of the healthcare system in Texas, and the action it took is consistent with recommendations by the Surgeon General and the American College of Surgeons.[50] *See* Abraham Decl. ¶ 8-9.

b.   Plaintiffs also assert that abortion is one of the "safest medical procedures in the United States," Compl. ¶ 40, yet also claim that "a delay of several weeks or even days may increase the risks." Compl. ¶ 71. But if abortion really is as safe as Plaintiff claim, these "risks" can only be minimal. Planned Parenthood made the same argument in *Casey*, but the plurality rejected it, concluding that "in the vast majority of cases, a 24-hour delay does not create any appreciable health risk." *Casey*, 505 U.S. at 885. And certainly, they would not exceed those of a cancer patient waiting for surgery, or a heart patient with a blockage waiting for a stent. The costs or risks of other procedures may rise as a result of the delay—cancer may metastasize, and tumors may grow and become more difficult to remove. But that alone does not invalidate a valid exercise of the State's police power to protect the public health, especially when it applies across the board to all providers.

c.   Plaintiffs also raise concerns about unnamed women being "forced to continue a pregnancy against their will," Compl. ¶ 70, having the expense of "buy[ing]

---

[50] Vice Adm. Jerome M. Adams, M.D., *Surgeon General: Delay Elective Medical, Dental Procedures to Help Us Fight Coronavirus*, (USA Today Mar. 22, 2019), https://www.usatoday.com/story/opinion/2020/03/22/surgeon-general-fight-coronavirus-delay-elective-procedures-column/2894422001/; Am. College of Surgeons, *COVID-19: Elective Case Triage Guidelines for Surgical Care*, Mar. 24, 2020, https://www.facs.org/covid-19/clinical-guidance/elective-case.

new clothes" due to "weight gain," Hagstrom-Miller Decl. ¶ 33, or being subjected to childbirth.[51] But again, they do not plead that there is any actual patient at any one of the seven plaintiff clinics that will not be able to receive an abortion because of EO GA-09's effectiveness for three weeks, Compl. ¶¶ 35-74.[52]

### b.   The benefits of EO GA-09 are compelling.

By contrast, the benefits of EO GA-09 are significant. *See* Abraham Decl. ¶ 8; Marier Decl. ¶ 14; Harstad Decl. ¶ 4. Plaintiffs claim that the Executive Order serves no benefit as to them, so this Court should exempt them from it. That is incorrect for four reasons.

First, restricting contact between patients, medical staff, and physicians at this time is beneficial to help prevent the spread of COVID-19, even if Plaintiffs' claims of taking steps to reduce contact are true. Abraham Decl. ¶ 7; *see* Marier Decl. ¶¶ 6, 11-12. Even if Plaintiffs' claims of low PPE usage are true, they are still using PPE that instead could be used for healthcare workers on the front lines of caring for COVID-19 patients. *See* Harstad Decl. ¶5. Even one extra mask could save the life of a physician or nurse caring for COVID-19 patients. The same goes for hospital beds and patients. *See* Part I.A.1.c *supra*. "Under current circumstances, available PPE should be directed to healthcare workers on the front lines of treating COVID-19 patients."

---

[51] Plaintiffs claim that the risk of dying in childbirth is fourteen times higher than from having an abortion. Compl. ¶ 41. But "this statement is unsupported by the literature and there is no credible scientific basis to support it." Byron Calhoun, *The Maternal Mortality Myth in the Context of Legalized Abortion*, Linacre Q. 2013 Aug. 80(3): 264-276, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6027002/.

[52] If there were any such patients, it is unlikely there would be many, given that only 3% of abortions in Texas occur after 17 weeks LMP (15 weeks post-fertilization). DX-5. Any woman so affected could seek as-applied relief—a far narrower demand than plaintiffs', which is to exempt all abortion doctors and clinics from a generally applicable executive order.

Abraham Decl. ¶ 6.

Second, if despite that the Court were inclined to think Plaintiff' impact on the healthcare system was insignificant, small effects can add up in a public health crisis. Even a few extra patients take up resources that could otherwise be used to treat COVID-19 patients, and if the healthcare system is stretched to its breaking point, those are resources that cannot be spared. To cite an earlier example, a mere 14 masks separates Anson General Hospital from risking transmission and further spread of COVID-19 from patients to healthcare workers.[53]

Indeed, the shortage of masks is critical. Abraham Decl. ¶ 6. The CDC told healthcare workers that they can use bandanas if nothing else is available.[54] The public is donating homemade masks to healthcare workers,[55] and Texas enlisted the help of inmates at Gatesville Correctional Facility to make cotton masks for the same reason.[56] There is no doubt that the surgical masks that Plaintiffs regularly use could help protect healthcare workers where N95 masks are unavailable.

Third, if one looks only at a small handful of providers or clinics, the impact on the State healthcare system could look small. But *every* individual physician or clinic could make the same argument. If Plaintiffs can perform abortions, why can't a plastic surgeon do face lifts, or an oral surgeon do dental surgery? Her procedures are

---

[53] Platoff, *supra* note 24.

[54] Centers for Disease Control and Prevention, *Strategies for Optimizing the Supply of Facemasks*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/ppe-strategy/facemasks.html.

[55] David Enrich, Rachel Abrams, and Steven Kurutz, *A Sewing Army, Making Masks for America*, (N.Y. Times, Mar. 25, 2020), https://www.nytimes.com/2020/03/25/business/coronavirus-masks-sewers.html.

[56] Deanna Hackney and Eric Levenson, *Texas Turns To Prison Labor to Help Cover Face Mask Shortages*, https://www.cnn.com/2020/03/22/us/texas-coronavirus-masktrnd/index.html.

performed on an outpatient basis, complications are rare, and she promises to minimize use of PPE. Her procedures alone would not impact the whole State, as Plaintiffs also argue. But following Plaintiffs" logic would lead to demands for exceptions that would swallow the rule. Under current circumstances, the State must treat all providers the same, and must attempt to solve problems quickly and in the aggregate. We have just days or weeks before a surge of COVID-19 cases here in Texas. If Texas has any hope of avoiding a situation like (or worse) than Italy's, and it is critical for everyone to do their part to prepare now. *See* Abraham Decl. ¶ 8.

Fourth, regardless of PPE or hospital bed capacity, requiring Plaintiff to comply with EO GA-09 benefits patients, the public, and Plaintiff themselves. As the Supreme Court stated in *Roe v. Wade*, the "State has a legitimate interest in seeing to it that abortion, like any other medical procedure, is performed under circumstances that insure maximum safety for the patient." 410 U.S. 113, 150 (1973). During this public health crisis, "maximum safety" for patients—and medical staff—is to minimize contact with others, especially in view of PPE shortage. If Plaintiff' facilities continue performing abortions, they will create continued close contact and encourage traveling, which will further spread the virus. Abraham Decl. ¶ 7; Marier Decl. ¶¶ 11-13.

* * *

Reading *Casey* like the Plaintiff do would mean that while the government could suspend basic liberty, property, and voting rights in the name of protecting public health in exigent circumstances, *see* Part I.A.2 *supra*, abortion rights alone are untouchable. But that reading is incorrect. Consistent with the longstanding precedent discussed above, abortion does not take precedence over every other right recognized

under the Constitution. Where the State's interests are sufficiently compelling—as they undoubtedly are here—the State may restrict individual liberties for a temporary period to address emergency situations. *Casey* and *Dobbs* are not to the contrary, and do not create a categorical exception for abortion that protects it from being regulated or restricted like other medical procedures in a public health crisis.

### B. Plaintiffs Cannot Satisfy the Other Elements Necessary for a Temporary Restraining Order.

Plaintiffs cannot show irreparable harm. *See Ridgely*, 512 F.3d at 734. As already discussed in Part I.A.3.a, Plaintiff' patients' alleged harm is limited to a three-week delay in receiving an abortion. And Plaintiffs did not allege in the Complaint that any particular patients of theirs will not be able to receive an abortion after EO GA-09 expires on April 21. They also fail to show any injury of their own. *See infra* II.

Conversely, public health will be harmed by continued performance of abortion procedures, so the balance of equities weighs decisively in the State's favor. *See Ridgely*, 512 F.3d at 734. COVID-19 is a serious and imminent threat to public health. Abraham ¶ 3. EO GA-09 is a necessary but temporary measure designed to prepare for an anticipated surge in COVID-19 infections over the next few days and weeks. *See* Part I.A.3.b; Abraham Decl. ¶ 3, 9; *see also* Marier Decl. ¶ 14.

The public interest also weighs heavily against the grant of a temporary restraining order. Uniform compliance with EO GA-09 is essential. Abraham Decl. ¶ 9. As explained above in Part I.A.3.b, when healthcare resources are stretched to the breaking point, every available resource helps. And allowing for exceptions defeats the purpose of the strong measures taken by the Governor to protect the public. In *Jacobsen*, where a plaintiff challenged a mandatory vaccination law because he did not agree with the benefits and wanted an exception—much like Plaintiff here—the Supreme

Court identified the fatal flaw with that kind of argument:

> We are not prepared to hold that a minority, residing or remaining in any
> city or town where smallpox is prevalent . . . may thus defy the will of its
> constituted authorities, acting in good faith for all, under the legislative
> sanction of the state. If such be the privilege of a minority, then a like privi-
> lege would belong to each individual of the community, and the spectacle
> would be presented of the welfare and safety of an entire population being
> subordinated to the notions of a single individual who chooses to remain a
> part of that population.

197 U.S. at 37–38. In a pandemic, if even one person fails to comply with measures
designed to slow the spread of the disease, devastating consequences can result.
South Korea's "Patient 31" is one example. She "traveled extensively through South
Korea, even after doctors had suggested she isolate herself due to a high likelihood
that she had been infected. The Korean Center for Disease Control found that she
ultimately had contact with approximately 1,160 people."[57]

Moreover, giving Plaintiff an exception may embolden others not pleased at hav-
ing to postpone procedures. Instead of fighting the virus during the very short and
precious time we have before a COVID-19 surge arrives (as it is beginning to in other
States), the State will be fighting to keep its rule intact in court, to the great detri-
ment of the public it is trying to protect.

* * *

Plaintiffs have failed to meet the exacting burden required to merit the extraor-
dinary remedy of a temporary restraining order. The Court should reject Plaintiff'

---

[57] Editorial Board, *Keep Your Distance: Patient 31 Illustrates Need for Social Distanc-
ing,* (Pittsburgh Post-Gazette, Mar. 20, 2020), https://www.post-gazette.com/opin-
ion/editorials/2020/03/20/Patient-31-South-Korea-social-distancing/sto-
ries/202003190019.

attempt to undermine the Governor's efforts to protect Texans in a time of unprecedented danger to public health.

## II.   Numerous Jurisdictional Defects Bar Any TRO.

"A district court's obligation to consider a challenge to its jurisdiction is non-discretionary." *In re Gee*, 941 F.3d 153, 159 (5th Cir. 2019). Before this Court can issue any order at all, it must assure itself of its own jurisdiction. *See id.*

### A.   Plaintiffs' claims against the Governor and the Attorney General are barred by sovereign immunity and Plaintiffs' lack of standing.

The Court cannot issue a TRO binding the Governor or the Attorney General because neither of these defendants has enforcement authority. In its absence, Plaintiffs cannot invoke the *Ex parte Young* exception to sovereign immunity. Similarly, Plaintiffs lack article III standing because, as to the Governor and Attorney General, they have shown neither an injury in fact nor redressability.

#### 1.   The *Ex parte Young* doctrine does not allow suit against the Governor and Attorney General, who do not have independent authority to enforce the Executive Order.

Plaintiffs' claims against the Governor and the Attorney General are barred by sovereign immunity because these defendants do not enforce EO GA-09 or the Emergency Rule. The State's sovereign immunity generally bars suits against state officers in their official capacities. The Supreme Court has carved out a narrow exception, the *Ex parte Young* doctrine, for cases where "a federal court commands a state official to do nothing more than refrain from violating federal law." *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 255 (2011); *see Ex parte Young*, 209 U.S. 123, 157 (1908). The exception "rests on the premise—less delicately called a 'fiction'—that when a federal court commands a state official to do nothing more than refrain from

violating federal law, he is not the State for sovereign-immunity purposes. The doctrine is limited to that precise situation . . . ." *Id.* *Ex parte Young* allows suit only when the defendant enforces the challenged statute. *See Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014). That is because, absent such a connection, the plaintiff has simply "ma[de] [the official] a party as a representative of the state," and such a suit is barred by the State's sovereign immunity. *Ex parte Young*, 209 U.S. at 157.

Plaintiffs do not allege the Governor has authority to prosecute or bring enforcement actions based on the Executive Order. *See* Compl. ¶ 21. Any prosecution would be brought by local officials, and any administrative enforcement action would be initiated by HHSC, the TMB, or the TBN. Because Plaintiffs' claims against the Governor are premised on making him a party purely "as a representative of the state," *Ex parte Young*, 209 U.S. at 157, those claims are barred by sovereign immunity and must be dismissed.

The claims against the Attorney General are also barred. He has no authority to implement the Emergency Rule. *Compare* Compl. ¶ 22, *with id.* ¶¶ 24, 66. As to criminal enforcement under EO GA-09, "[w]hile the Attorney General may offer assistance in certain criminal cases . . . county and district attorneys are granted the authority to prosecute criminal matters." *Starr v. County of El Paso*, No. EP-09-CV-353-KC, 2010 WL 3122797, at *5 (W.D. Tex. Aug. 5, 2010). The Attorney General can assist only "[a]t the request of a district attorney, criminal district attorney, or county attorney." Tex. Gov't Code § 402.028(a); *see* Compl. ¶ 22 & n.2.

The plaintiff seeking to invoke *Ex parte Young* must show that official "is likely to" enforce the statute against it. *City of Austin v. Paxton*, 943 F.3d 993, 1002 (5th Cir. 2019). Plaintiffs do not allege any of the District Attorney Defendants is likely to

seek assistance from the Attorney General, much less that such a request is imminent. Injury that relies on such an "attenuated chain of inferences" does not suffice. *Clapper*, 568 U.S. at 414 n.5. Because no such action is likely, the Court lacks jurisdiction to enjoin the Attorney General. *See id.*; *see, e.g.*, *Entm't Software Ass'n v. Foti*, 451 F. Supp. 2d 823, 827–28 (M.D. La. 2006). Plaintiffs' claims against the Attorney General, like those against the Governor, are barred by sovereign immunity.

### 2. Plaintiffs lack article III standing to sue the Governor and Attorney General because, as to these defendants, Plaintiffs have not alleged injury in fact or redressability.

For much the same reasons, Plaintiffs lack standing to sue the Governor and Attorney General. *See City of Austin*, 943 F.3d at 1002–03 (discussing the relationship between *Ex parte Young*'s requirements and article III standing). A plaintiff seeking relief in federal court must first plausibly allege "an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (internal citations and quotation marks omitted). The "threatened injury must be certainly impending to constitute injury in fact, and . . . allegations of possible future injury are not sufficient." *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 410 (2013) (quotations and brackets omitted). "By ensuring a future injury is not 'too speculative,' the imminence requirement [of article III standing] 'reduce[s] the possibility of deciding a case in which no injury would have occurred at all.'" *Ctr. for Biological Diversity v. United States Envt'l Prot. Agency*, 937 F.3d 533, 537 (5th Cir. 2019) (quoting *Lujan*, 504 U.S. at 564 n.2).

Plaintiffs have not alleged an injury in fact traceable to the Governor or the Attorney General. A plaintiff's decision to forego action based on speculation is not an

injury sufficient to confer standing." *Zimmerman v. City of Austin*, 881 F.3d 378, 389–90 (5th Cir. 2018); *see also Ctr. for Biological Diversity*, 937 F.3d at 540–42; *Glass v. Paxton*, 900 F.3d 233, 240 (5th Cir. 2018). Because there is no likelihood these officials will take enforcement action, Plaintiffs' asserted injuries are not "fairly traceable to the challenged action of the defendant." *Lujan,* 504 U.S. at 560 (quotation and alterations omitted).

Next, the plaintiff must show it is "likely," as opposed to merely "speculative," that the claimed injury will be "redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976)). Plaintiffs' claims against the Governor and the Attorney General do not meet this standard. Plaintiffs seek an order enjoining the Governor and the Attorney General from "enforc[ing ] the Executive Order and Emergency Rule, as interpreted by Defendants, to prohibit abortions." Pls. Mot. TRO 28.

That order would not accomplish anything. Plaintiffs want the Court to order the Governor not to do something he cannot do anyway; the Governor does not enforce either the Executive Order or the Emergency Rule. The same is true as to the Attorney General, whose involvement in any potential prosecution is speculative at best. *See* Part II.A.1 *supra*. So an order against the Governor or the Attorney General would not redress Plaintiffs' claimed injury—the threat of prosecution and administrative enforcement. Plaintiffs do not have article III standing to sue the Governor or the Attorney General.

**B.  Plaintiffs lack third-party standing to challenge EO GA-09 on behalf of their unidentified patients.**

Plaintiffs are abortion clinics and an abortion doctor, not women seeking abortions.[58] Section 1983 provides a cause of action only when *the plaintiff* suffers "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. It does not provide a cause of action based on the violation of a third party's rights. *See Coon v. Ledbetter*, 780 F.2d 1158, 1160 (5th Cir. 1986) ("[Plaintiffs] [a]re required to prove some violation of their personal rights."). When "[t]he alleged rights at issue" belong to a third party, rather than the plaintiff, the plaintiff lacks statutory standing, regardless of whether the plaintiff has suffered his own injury. *Danos v. Jones*, 652 F.3d 577, 582 (5th Cir. 2011); *see also Conn v. Gabbert*, 526 U.S. 286, 292–93 (1999) (holding that a lawyer "clearly had no standing" to bring a section 1983 claim because a plaintiff "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties").

And even if section 1983 did not prohibit Plaintiffs from relying on the rights of third parties, the Supreme Court's doctrine of prudential standing would. To have standing in a typical lawsuit, a litigant must assert his own rights, not those of a third party. *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004). A litigant may assert a third party's rights only when (1) the litigant has a "close" relationship with the third party; and (2) some "hindrance" affects the third party's ability to protect her own

---

[58]    *See* Compl. ¶¶ 69, 74–79 (alleging claims based on "patients' fundamental right to abortion"); Pls. TRO Mot. 25 (arguing "[t]he Attorney General's interpretation of the Executive Order prevents Texans from exercising their fundamental constitutional right to terminate a pregnancy").

interests. *Id.* at 130; *see also South Carolina v. Regan*, 465 U.S. 367, 380 (1984) (explaining that third-party standing is "the exception rather than the rule"). Neither requirement is met here.

As to a "close relationship," plaintiffs pointedly do not identify any particular patient who will be unable to obtain "abortion care" as a result of EO GA-09. Instead, they refer to hypothetical "patients" whose "abortions will be delayed, and in some cases, denied altogether." Compl. ¶ 69. A hypothetical relationship does not support third-party standing. *See Kowalski*, 543 U.S. at 131. The lack of an existing relationship with the patients on whose behalf plaintiffs bring suit prohibits application of the third-party-standing doctrine. *See id.* Moreover, there is no genuine obstacle to a woman challenging an abortion regulation. *See id.* at 130. Women can and do bring such challenges. *See, e.g., J.D. v. Azar*, 925 F.3d 1291 (D.C. Cir. 2019) (per curiam); *Doe v. Parson*, 368 F. Supp. 3d 1345 (E.D. Mo. 2019).

Neither the Fifth Circuit nor the Supreme Court has allowed third-party standing under factual circumstances like the ones here. *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328 (5th Cir. 1981), is not to the contrary. In *Deerfield*, the Fifth Circuit allowed third party standing for a would-be abortion clinic challenging a city commission's decision to deny it a conditional-use license to operate in the city's business district. 661 F.2d at 334. It is hard to see how a woman seeking an abortion—even in the early months of her pregnancy—could challenge a land-use decision, then have an abortion performed at the not-yet operational clinic. But there is no barrier to a woman challenging EO GA-09 if she believes it burdens her rights.[59]

---

[59] And even if *Deerfield* forecloses a challenge to third-party standing, State Defendants raise the issue to preserve it for further review. The Supreme Court is presently examining the issue in *June Medical Services, LLC v. Russo*, No. 18-1323.

## C.  The Court lacks jurisdiction to opine on the meaning of state law under *Pennhurst*.

Under Pennhurst, federal courts lack authority to order state officials to comply with state law. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984). "[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment." *Id.* The gravamen of Plaintiffs' complaint is that the Attorney General has misinterpreted state law in the press release—without the press release, they say "Plaintiffs' provision of [abortions] is entirely consistent with the Governor's Executive Order." Pls. Mot. TRO 2; *see also id.* at 12–14; Compl. ¶¶ 4, 63. To the extent plaintiffs ask the Court to interpret EO GA-09 to permit their abortion procedures, their claim is beyond this Court's jurisdiction. This Court cannot issue a TRO on this basis. *See Papasan*, 478 U.S. at 277; *Pennhurst*, 451 U.S. at 106.

## D.  The *Pullman* abstention doctrine prohibits the Court from issuing a TRO.

Where an antecedent question of state law would obviate the need to address a federal constitutional question, *R.R. Comm'n v. Pullman Co.*, 312 U.S. 496, 500 (1941), the Supreme Court has instructed federal courts to abstain from "employ[ing] their "historic powers as [courts] of equity," *Fair Assessment in Real Estate Ass'n v. McNary*, 454 U.S. 100, 120 (1981) (Brennan, J., concurring). This doctrine applies where the state law question would "significantly modify" the federal analysis. *Lake Carriers Ass'n v. MacMullan*, 406 U.S. 498, 512 (1972).

Plaintiffs allege that *as interpreted in the Attorney General's press release* the Executive Order violates their patients' federal constitutional rights. *See* Compl. ¶¶ 75, 78. Their constitutional challenge would be obviated if they are correct that

EO GA-09 permits them to continue performing abortions (though they are not). *See* Compl. ¶¶ 4, 63; Pls. Mot. TRO 2, 12–14. On Plaintiffs' own theory, then, the application of the Executive Order to plaintiffs' abortions is "uncertain." *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 236 (1984). If Plaintiffs are right about that, the Court should abstain from unnecessarily addressing the constitutional questions.

## CONCLUSION

For the foregoing reasons, the State Defendants respectfully request that the Court deny the motion for a temporary restraining order.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

RYAN L. BANGERT
Deputy First Assistant Attorney General

DARREN MCCARTY
Deputy Attorney General for Civil Litigation

THOMAS A. ALBRIGHT
Chief, General Litigation Division

/s/ Andrew B. Stephens
ANDREW B. STEPHENS
Texas Bar No. 24079396
BENJAMIN S. WALTON
Texas Bar No. 24075241
Assistant Attorneys General
General Litigation Division

HEATHER GEBELIN HACKER
Assistant Solicitor General
Texas Bar No. 24103325

Office of the Attorney General
300 West 15th Street
P.O. Box 12548
Austin, Texas 78711-2548
(512) 463-2120 (phone)
(512) 320-0667 (fax)

Attorneys for State Defendants

## CERTIFICATE OF FILING AND SERVICE

I certify that on March 30, 2020, this document was served through the Court's CM/ECF Document Filing System or through electronic mail, upon the following counsel of record:

Patrick J. O'Connell
Law Offices of Patrick J. O'Connell PLLC
5926 Balcones Dr., Ste. 220
Austin, TX 78731
(512) 852-5918
pat@pjofca.com

Julie Murray
Alice Clapman
Richard Muniz
Hannah Swanson
Planned Parenthood Federation of America
1110 Vermont Ave., NW Ste. 300
Washington, D.C. 20005
(202) 973-4800
julie.murray@ppfa.org
alice.clapman@ppfa.org
richard.muniz@ppfa.org
hanna.swanson@ppfa.org

Jennifer Sandman
Planned Parenthood Federation of America
123 William Street
New York, NY 10038
(212) 541-7800
jennifer.sandman@ppfa.org

Molly Duane
Rabia Muqaddam
Francesca Cocuzza
Center for Reproductive Rights
199 Water St. 22nd Floor
New York, NY 10038
 (917) 637-3631
mduane@reprorights.org
rmuqaddam@reprorights.org
fcocuzza@reprorights.org

Stephanie Toti
Rupali Sharma
Sneha Shah
Lawyering Project
25 Broadway, Fl. 9
New York, NY 10004
(646) 490-1083
stoti@lawyeringproject.org
rsharma@lawyeringproject.org
sshah@lawyeringproject.org

/s/ Andrew B. Stephens
ANDREW B. STEPHENS
Assistant Attorney General