# IN THE UNITED STATES DISTRICT COURT

## FOR THE WESTERN DISTRICT OF TEXAS

### AUSTIN DIVISION

| | | |
|---|---|---|
| PLANNED PARENTHOOD CENTER FOR CHOICE, et al., | § | |
| | § | |
| | § | |
| Plaintiffs, | § | Civil Action No. 1:20-cv-00323-LY |
| | § | |
| v. | § | |
| | § | |
| GREG ABBOTT, et al., | § | |
| | § | |
| Defendants. | § | |

### STATEMENT OF INTEREST
### OF THE STATES OF ALABAMA, ARKANSAS, IDAHO, INDIANA, KENTUCKY, LOUISIANA, MISSISSIPPI, MISSOURI, NEBRASKA, OHIO, OKLAHOMA, SOUTH CAROLINA, SOUTH DAKOTA, TENNESSEE, UTAH, AND WEST VIRGINIA

**Lill Firm, P.C.**
DAVID S. LILL
State Bar No. 12352500
4407 Bee Caves Road, Suite 111
Austin, Texas 78746
Telephone: (512) 330-0252
Facsimile: (844) 402 9814
Email: david@lillfirm.com

**Jeff Landry**
LOUISIANA ATTORNEY GENERAL
ELIZABETH B. MURRILL
 *Solicitor General*
JOSEPH S. ST. JOHN
 *Deputy Solicitor General*
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third Street
Baton Rouge, LA 70804
Tel: (225) 456-7544 (cell)
emurrill@ag.louisiana.gov
stjohnj@ag.louisiana.gov

**BACKGROUND**

In the span of only two weeks, the COVID-19 virus has upended life as most people know it. Louisiana has gone from one confirmed case on March 9 to 3,540 active cases and 151 deaths on March 29, with a tenfold increase in only *10 days*.[1] The Governor of Louisiana is standing up a 1,000 bed field hospital in a New Orleans convention center, while health care personnel face the real possibility of systemic collapse of the health care system.[2]

Washington, New Jersey, Michigan, and Illinois are experiencing exponential growth in COVID19 cases. Other states, including Texas, are on similar tracks. As of Sunday, March 29, the United States had registered approximately 125,000 COVID-19 infections and 2,200 deaths.[3] Dr. Anthony Fauci, Director of the National Institute of Allergy and Infectious Disease and a now-familiar face to Americans everywhere, warned that the outbreak could kill 100,000–200,000 Americans. Officials throughout the country are warning of shortages of personal protective equipment ("PPE") used to protect healthcare providers and prevent the spread of infections.

COVID-19 appears to be transmissible by asymptomatic and presymptomatic carriers.[4] The virus has an incubation period of up to 14 days, during which "[i]nfected individuals produce a large quantity of virus . . . , are mobile, and carry on usual activities, contributing to the spread of infection."[5] The virus can remain on surfaces many days[6], and patients may remain infectious for weeks after their symptoms subside.[7] Not surprisingly, healthcare professionals have tested positive

---

[1] http://ldh.la.gov/Coronavirus/
[2] https://www.wwltv.com/article/news/health/coronavirus/1000-beds-at-convention-center-field-hospital-to-help-with-surge-capacity/289-d8a4bfc1-ffa6-4124-a545-40961d5fd64d
[3] https://www.reuters.com/article/us-health-coronavirus-usa/us-virus-deaths-could-reach-200000-fauci-warns-as-medical-supplies-run-short-idUSKBN21G0ME
[4] https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e3.htm?s_cid=mm6912e3_w
[5] https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(20)30374-3/fulltext
[6] https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e3.htm?s_cid=mm6912e3_w
[7] https://www.thelancet.com/journals/langas/article/PIIS2468-1253(20)30083-2/fulltext

even while going to great lengths to protect themselves,[8] and healthcare facilities have been identified as a vector for COVID-19 transmission.[9]

Citing the grave threat posed by the epidemic, the President declared a national emergency March 13, 2020.[10] He then invoked the Defense Production Act to prioritize and allocate medical resources, to prevent hoarding of resources, and "to expand domestic production of health and medical resources needed to respond to the spread of COVID-19, including personal protective equipment and ventilators."[11] At the same time, the Centers for Disease Control and Prevention ("CDC") issued guidance that healthcare providers should "delay all elective ambulatory provider visits" and "delay inpatient and outpatient elective surgical procedural cases."[12] The CDC explained that doing so "can preserve staff, personal protective equipment, and patient care supplies; ensure staff and patient safety; and expand available hospital capacity during the COVID-19 pandemic." Indeed, the CDC issued detailed guidance on optimizing the supply of PPE under both contingency and crisis conditions.[13] The Centers for Medicare and Medicaid Services ("CMS") issued detailed recommendations, prefaced as:

> To aggressively address COVID-19, CMS recognizes that conservation of critical resources such as ventilators and Personal Protective Equipment (PPE) is essential, as well as limiting exposure of patients and staff to the SARS-CoV-2 virus. Attached is guidance to limit non-essential adult elective surgery and medical and surgical procedures, including all dental procedures. These considerations will assist in the management of vital healthcare resources during this public health emergency.[14]

---

[8] https://www.ajc.com/news/state--regional-govt--politics/nine-doctors-positive-for-coronavirus-according-gupta/2pBtOgGO0ibyUgGX0wAR4O/

[9]  https://catalyst.nejm.org/doi/full/10.1056/CAT.20.0080

[10] https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/

[11] https://www.whitehouse.gov/presidential-actions/eo-delegating-additional-authority-dpa-respect-health-medical-resources-respond-spread-covid-19/

[12]  https://www.cdc.gov/coronavirus/2019-ncov/healthcare-facilities/index.html

[13] https://www.cdc.gov/coronavirus/2019-ncov/hcp/ppe-strategy/index.html

[14] https://www.cms.gov/files/document/31820-cms-adult-elective-surgery-and-procedures-recommendations.pdf

The CMS concern with PPE shortages was palpable: it noted even "dental procedures use PPE," and "to reduce the risk of spread and to preserve PPE, we are recommending that all non-essential dental exams and procedures be postponed until further notice." Heeding that advice, healthcare providers have deferred a wide variety of procedures, even life-saving transplants.[15]

Consistent with the declaration of a national emergency, Texas' Governor declared a state of disaster in connection with the COVID-19 pandemic.[16] On March 19, 2020, the Commissioner of the Texas Department of State Health Services certified:

> the introduction and spread of the communicable disease known as COVID-19 in the State of Texas has created an immediate threat, poses a high risk of death to a large number of people and creates a substantial risk of public exposure because of the disease's method of transmission and evidence that there is community spread in Texas.[17]

The Commissioner therefore declared a public health disaster. In reliance on that declaration and guidance issued by the CDC, the Governor issued executive orders prohibiting gatherings of more than 10 people,[18] requiring daily reports of hospital utilization,[19] and quarantining travelers from certain areas.[20] On March 22, the Governor found that hospital capacity and personal protective equipment were being depleted by surgeries and procedures that were not medically necessary. He therefore additionally ordered that

> all licensed health care professionals and all licensed health care facilities shall postpone all surgeries and procedures that are not immediately medically necessary to correct a serious medical condition of, or to preserve the life of, a patient who

---

[15] https://www.wsj.com/articles/coronavirus-threat-forces-longer-waits-for-some-organ-transplant-patients-11585137601

[16] https://gov.texas.gov/uploads/files/press/DISASTER_covid19_disaster_proclamation_IMAGE_03-13-2020.pdf

[17] https://gov.texas.gov/news/post/dr-john-hellerstedt-issues-public-health-disaster-declaration-in-texas

[18] https://gov.texas.gov/uploads/files/press/EO-GA_08_COVID-19_preparedness_and_mitigation_FINAL_03-19-2020_1.pdf

[19] https://gov.texas.gov/news/post/governor-abbott-issues-executive-order-to-strengthen-reporting-capabilities

[20] https://gov.texas.gov/news/post/governor-abbott-issues-executive-order-mandating-14-day-quarantine-for-travelers-arriving-from-new-york-tri-state-area-new-orleans2

without immediate performance of the surgery or procedure would be at risk for serious adverse medical consequences or death, as determined by the patient's physician[.][21]

The following day, Texas Attorney General Ken Paxton explained:

This prohibition applies throughout the State and to all surgeries and procedures that are not immediately medically necessary, including routine dermatological, ophthalmological, and dental procedures, as well as most scheduled healthcare procedures that are not immediately medically necessary such as orthopedic surgeries or any type of abortion that is not medically necessary to preserve the life or health of the mother.

The COVID-19 pandemic has increased demands for hospital beds and has created a shortage of personal protective equipment needed to protect health care professionals and stop transmission of the virus. Postponing surgeries and procedures that are not immediately medically necessary will ensure that hospital beds are available for those suffering from COVID-19 and that PPEs are available for health care professionals.[22]

## **ARGUMENT**

## I.   **STATES HAVE VAST POWER TO PROTECT THE PUBLIC FROM EPIDEMICS.**

The States' police power "is universally conceded to include everything essential to the public safety, health, and morals, and to justify the destruction or abatement, by summary proceedings, of whatever may be regarded as a public nuisance." *Lawton v. Steele*, 152 U.S. 133, 136 (1894). "The power to protect the public health lies at the heart of [that] power." *Banzhaf v. F.C.C.*, 405 F.2d 1082, 1096-97 (D.C. Cir. 1968). Indeed, protection of the public health "has sustained many of the most drastic exercises of that power, including quarantines, condemnations, civil commitments, and compulsory vaccinations." *Id.* And where necessity warrants, States may go further still. *See, e.g., United States v. Caltex*, 349 U.S. 149 , 154 (1953) ("[T]he common law had long recognized that in times of imminent peril—such as when fire threatened a whole community—the sovereign could, with immunity, destroy the property of a few that the property of many and the

---

[21] https://gov.texas.gov/news/post/governor-abbott-issues-executive-order-increasing-hospital-capacity-announces-supply-chain-strike-force-for-covid-19-response2
[22] https://www.texasattorneygeneral.gov/news/releases/health-care-professionals-and-facilities-including-abortion-providers-must-immediately-stop-all

lives of many more could be saved."); *Bowditch v. City of Boston*, 101 U.S. 16, 18 (1879) ("There are many other cases besides that of fire—some of them involving the destruction of life itself—where the same rule is applied. The rights of necessity are a part of the law.").

*Jacobson v. Massachusetts*, 197 U.S. 11 (1905), is instructive. In *Jacobson*, Massachusetts authorized a board of health to require vaccination "if, in its opinion, it is necessary for the public health or safety." *Id.* at 12-13. Reciting that "smallpox . . . was prevalent to some extent in the city of Cambridge, and the disease was increasing," the city of Cambridge adopted a mandatory vaccination regulation. *Id.* at 12-13, 27-28. Jacobsen was convicted for refusing to be vaccinated. *Id.* at 21. The Supreme Court rejected his Fourteenth Amendment challenge, explaining that "[u]pon the principle of self-defense, of paramount necessity, a community has the right to protect itself against an epidemic of disease which threatens the safety of its members." *Id.* at 27.

Pointing to the State's authority to conscript for military service and to forcibly quarantine its citizens, the Court held that "in every well-ordered society charged with the duty of conserving the safety of its members the rights of the individual in respect of his liberty may at times, under the pressure of great dangers, be subjected to . . . restraint." *Id.* at 29. The Court acknowledged the "power of a local community to protect itself against an epidemic . . . might be exercised in particular circumstances and in reference to particular persons in such an arbitrary, unreasonable manner, or might go so far beyond what was reasonably required for the safety of the public, as to authorize or compel the courts to interfere[.]" *Id.* at 28. But where the existence of the emergency was undisputed, the Court declined to "usurp the functions of another branch of government" by reweighing the risks and benefits of the emergency action. *Id.* at 27-28, 36-37.

Similarly, in *Compagnie Francaise de Navigation a Vapeur v. State Board of Health*, 186 U.S. 380 (1902), the Supreme Court upheld a geographic quarantine of several parishes around New Orleans. That quarantine sought to "exclude healthy persons from a locality infested with a contagious or

infectious disease." *Id.* at 385. "The object in view was to keep down, as far as possible, the number of persons to be brought within danger of contagion or infection, and by means of this reduction to accomplish the subsidence and suppression of the disease and the spread of the same." *Id.* The quarantine was held not to violate the Fourteenth Amendment. *Id.* at 387, 393.

The United States has thankfully had limited experience with epidemics for over 100 years. *Hickox v. Christie*, 205 F. Supp. 3d 579 (D.N.J. 2016), for example, is one of only a handful of postwar cases addressing the power of a State to quarantine. But that case makes clear that *Jacobson* and *Compagnie Francaise* remain good law. In *Hickox*, a nurse who returned to New Jersey after caring for ebola patients was quarantined and sued State officials alleging Fourth and Fourteenth Amendment violations. *Id.* at 584. The court began by pragmatically observing "[t]he State is entitled to some latitude . . . in its prophylactic efforts to contain what is, at present, an incurable and often fatal disease." *Id.* at 584. The court then explained that although "the federal government has the power to declare and enforce a quarantine," it generally plays "a supportive role, with the States taking the lead in quarantine matters." *Id.* at 590-91.

With respect to ebola, the CDC had issued guidance that healthcare workers who had provided care to ebola victims were at higher risk for viral exposure and suggested that "additional precautions may be recommended." *Id.* at 590. Ms. Hickox was detained pursuant to an executive order by the New Jersey Governor that was consistent with the CDC's guidance. *Id.* at 585, 591. The court rejected Hickox's contention "that she wore protective gear and took appropriate measures to prevent the spread of disease." *Id.* "The authorities were not required . . . to take it on faith that Ms. Hickox had been 100% compliant, or the measures 100% effective." *Id.* Citing *Jacobsen*, and *Compagnie Francaise*, the court found no unconstitutionality. *Id.* at 591-94. It concluded that "[t]o permit these constitutional claims to go forward . . . would be a judicial second-guessing of the

discretionary judgments of public health officials acting within the scope of their (and not [the court's]) expertise." *Id.* at 594.

That the States' vast power to deal with epidemics has been repeatedly upheld is unsurprising. The Fourteenth Amendment does not ban the deprivation of any right. Rather, it provides that no State shall "deprive any person of life, liberty, or property without due process of law." Even as to fundamental rights, "the process due in any given instance is determined by weighing 'the private interest that will be affected by the official action' against the Government's asserted interest, 'including the function involved' and the burdens the Government would face in providing greater process." *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). Where the government's interests are sufficiently compelling, even the most fundamental rights will yield. *See, e.g.*, *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008) ("Like most rights, the right secured by the Second Amendment is not unlimited."); *Kansas v. Hendricks*, 521 U.S. 346, 366 (1997) (upholding civil commitment of persons who pose a danger to others); *Near v. Minnesota*, 283 U.S. 697, 716 (1931) ("No one would question but that a government might prevent . . . the publication of the sailing dates of transports or the number and location of troops.").[23]

## II. PLAINTIFFS ARE NOT ENTITLED TO A CATEGORICAL EXEMPTION FROM EMERGENCY RULES, ISSUED UNDER RAPIDLY-DEVELOPING EMERGENCY CONDITIONS, THAT THREATEN THE HEALTH AND SAFETY OF MILLIONS.

Plaintiffs concede COVID-19 is a "worldwide pandemic," "federal and state officials expect a surge of infections . . . to test the limits of the healthcare system," and "[h]ealthcare workers are facing a shortage of [at least] certain types of PPE." Compl. ¶ 45. They further concede they "use some PPE," Compl. ¶ 54, including "gloves, a surgical mask, disposable protective eyewear,

---

[23] This Court has already found that a fundamental right must yield to the public interests: it has twice continued various criminal proceedings after finding continuances due to COVID-19 outweigh a defendant's right to a speedy trial.

disposable or washable gowns, hair covers, and shoe covers. Mem. at 8. Finally, Plaintiffs concede the FDA believes "demand could exceed supply" even for gloves. Compl. ¶ 54 n.26. Plaintiffs nevertheless ask this Court to "usurp the functions of another branch of government," *Jacobson,* 197 U.S. at 28, by reweighing the risks and benefits of Governor Abbott's emergency action. That the court cannot do. *Id.* at 28, 39.

Plaintiffs spend pages rehashing the existence of a right to abortion and demand a blanket exemption—not granted for any other provider or procedure—from a facially neutral regulation that is applicable to all surgeries and medical procedures.[24] That regulation complies with *Jacobson*, 197 U.S. at 38-39, and provides a full exception for procedures "immediately medically necessary to correct a serious medical condition of, or to preserve the life of, a patient." Plaintiffs nevertheless insist they are entitled to an extraordinary exception and that *their* judgment should override the judgment of subject matter experts at *every level of government* that the health of the public as a whole, medical provider health, and PPE should be protected and conserved, together with the judgment that delaying medical procedures will protect the public from the spread of a deadly disease.

Professional bodies have emphasized that patient-specific judgment is what the situation requires. The American College of Surgeons emphasizes that "[p]lans for case triage should avoid blanket policies and instead rely on data and expert opinion from qualified clinicians and administrators, with a site-specific granular understanding of the medical and logistical issues in play."[25] And while doctors all over the country are responsibly exercising such case-specific judgment, Plaintiffs' doctors apparently contend they cannot be required to exercise patient-specific

---

[24] *Jacobson* contemplates individual, as-applied challenges even to emergency public health orders. 197 U.S. at 38-39. Modern abortion law is in accord. *See generally Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320 (2006). Plaintiffs do not pursue that option, and instead pursue a broad challenge that is adverse to the interest of at least any patient who would be able to pursue such an individual challenge. *Cf. Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 15 & n.7 (2004) (third party standing vitiated by potential conflict of interest).

[25] https://www.facs.org/covid-19/clinical-guidance/triage

judgment as to the medical necessity of an abortion. That conclusion is not only medically unsupportable, but also irresponsible and dangerous.

### III. THIS CASE POSES A GRAVE THREAT TO STATE AUTHORITY TO PROTECT PUBLIC HEALTH.

This case is not occurring in isolation. Almost all states have issued similar emergency restrictions on medical procedures that are not immediately medically necessary. At the same time, our States are experiencing this disaster at different levels of development. Governors, in consultation with public health experts and federal experts, simply must have the flexibility to address the rapidly changing needs in each of their states. The federal judiciary, moreover, is uniquely unsuited to the task it is being asked to undertake—second-guessing the judgment of infectious disease experts, public health system and state disaster managers, and officials expressly tasked with protecting the health and safety of their state's residents from a deadly contagious virus.

Plaintiffs specifically ask this Court to interfere in Texas' decisions on the basis of weak evidence that actually demonstrates the threat to the clinics patients, staff, and the public as a whole. Each of the Plaintiffs treats *thousands* of patients per year, many for surgical abortions. *E.g.*, Dewitt-Dick Decl. (ECF 7-2) ¶ 2; Klier Decl. (ECF 7-5) ¶ 9. Yet all insist that they do not use significant amounts of PPE, *see, e.g.*, Dewitt-Dick Decl. ¶ 6, raising concerns about the adequacy of staff and patient protection. Some appear to extensively use PPE. Dewitt-Dick Decl. (ECF 7-2) ¶ 19-20. But some are, astonishingly, having doctors and staff use the same PPE for multiple procedures. Barraza Decl. (ECF 7-1) ¶ 7. Others appear to make use of PPE entirely *optional* despite the obvious necessity of close contact with patients. Ferringo Decl. (ECF 7-3) ¶¶ 10, 12 (noting that "*some* physicians also use surgical masks, disposable shoe covers, and reusable goggles" and "the staff member *may* use gloves, a surgical gown, face shield, or disposable shoe covers.").

Given their patients volume, Plaintiffs have likely treated at least some individuals infected with COVID-19, even if asymptomatic. At least one implicitly acknowledges having treated patients

"for whom there is a concern for COVID-19" by giving the patients "a mask" but apparently not protecting staff with an N95 respirator. Barraza Decl. ¶ ¶ 7 n.1, 8. And Southwestern baldly states that it "would" treat a patient with COVID-19 by supplying the patient with a N95 respirator. Dewitt-Dick Decl. ¶ 2. Southwest confesses it sent symptomatic staff home, but has apparently not followed CDC guidance requiring all staff who may have been in contact with a symptomatic person to self-quarantine. *See* Dewitt-Dick Decl. ¶ 13-14. Far from providing grounds for an exception to Governor Abbott's order, Plaintiffs declarations prove they should not be performing any procedures while a deadly virus is spreading through the nation.[26]

Regardless, in the middle of *responding* to this threat as it unfolds, States should not be required to provide blanket exclusions to public health orders when such exclusions undoubtedly threaten the public as a whole, and no federal court should assume that grave responsibility. It was well within the State's power to articulate a simple, workable rule requiring physicians to defer procedures that are not immediately medically necessary.

## <u>CONCLUSION</u>

Plaintiffs invite this Court on a perilous journey. They challenge emergency orders issued by the Governor of Texas under conditions expressly authorized by Texas law, when his powers are at a zenith, and to address a grave threat to public health. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635-37 (Jackson, J., concurring). Plaintiffs nevertheless ask this Court to permit medical procedures that, in the judgment of both State and Federal experts, risk further spreading a deadly epidemic. This Court should decline that request.

---

[26] Plaintiffs declarations are from administrators, business managers and two doctors who are not experts in epidemiology or infectious disease and who offer no opinions on these issues.  Their backgrounds and training are insufficient to even compare with the expert opinions of State and Federal public health officials responding to the pandemic.

Dated March 30, 2020                    Respectfully submitted,

**LILL FIRM, P.C.**

By: _/s/ David S. Lill_

> DAVID S. LILL
> State Bar No. 12352500
> 4407 Bee Caves Road, Suite 111
> Austin, Texas 78746
> Telephone: (512) 330-0252
> Facsimile: (844) 402 9814
> Email: david@lillfirm.com

> **JEFF LANDRY**
> **LOUISIANA ATTORNEY GENERAL**
> *ELIZABETH B. MURRILL
>   *Solicitor General*
> *JOSEPH S. ST. JOHN
>   *Deputy Solicitor General*
> LOUISIANA DEPARTMENT OF JUSTICE
> 1885 N. Third Street
> Baton Rouge, LA 70804
> Tel: (225) 456-7544 (cell)
> emurrill@ag.louisiana.gov
> stjohnj@ag.louisiana.gov
> *pro hac vice applications pending*

Steve Marshall
Alabama Attorney General

Leslie Rutledge
Arkansas Attorney General

Lawrence Wasden
Idaho Attorney General

Curtis T. Hill Jr.
Indiana Attorney General,

Daniel Cameron
Kentucky Attorney General,

Lynn Fitch
Mississippi Attorney General,

Eric Schmitt
Missouri Attorney General

Douglas J. Peterson
Nebraska Attorney General

Dave Yost
Ohio Attorney General,

Mike Hunter
Oklahoma Attorney General

Alan Wilson
South Carolina Attorney General

Jason Ravnsborg
South Dakota Attorney General

Herbert Slatery III
Tennessee Attorney General

Sean Reyes
Utah Attorney General

Patrick Morrisey
West Virginia Attorney General