**RECEIVED**

APR 1 7 2020

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
        DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

**FILED**

APR 1 7 2020

CLERK, U.S. DISTRICT CLERK
WESTERN DISTRICT OF TEXAS
BY _____
                    DEPUTY

PLANNED PARENTHOOD CENTER FOR
CHOICE; PLANNED PARENTHOOD OF
GREATER TEXAS SURGICAL HEALTH
SERVICES; PLANNED PARENTHOOD SOUTH
TEXAS SURGICAL CENTER; WHOLE WOMAN'S
HEALTH; WHOLE WOMAN'S HEALTH
ALLIANCE; SOUTHWESTERN WOMEN'S
SURGERY CENTER; BROOKSIDE WOMEN'S
MEDICAL CENTER PA d/b/a BROOKSIDE
WOMEN'S HEALTH CENTER AND AUSTIN
WOMEN'S HEALTH CENTER; ROBIN
WALLACE, M.D.; HOUSTON WOMEN'S CLINIC;
ALAMO CITY SURGERY CENTER PLLC d/b/a
ALAMO WOMEN'S REPRODUCTIVE SERVICES;
and HOUSTON WOMEN'S REPRODUCTIVE
SERVICES,

      Plaintiffs,

      v.

GREG ABBOTT, in his official capacity as Governor
of Texas; KEN PAXTON, in his official capacity as
Attorney General of Texas; PHIL WILSON, in his
official capacity as Acting Executive Commissioner
of the Texas Health and Human Services
Commission; STEPHEN BRINT CARLTON, in his
official capacity as Executive Director of the Texas
Medical Board; KATHERINE A. THOMAS, in her
official capacity as the Executive Director of the
Texas Board of Nursing; MARGARET MOORE,
District Attorney for Travis County; JOE
GONZALES, Criminal District Attorney for Bexar
County; JOHN CREUZOT, District Attorney for
Dallas County; JAIME ESPARZA, District Attorney
for El Paso County; KIM OGG, Criminal District
Attorney for Harris County; RICARDO
RODRIGUEZ, JR., Criminal District Attorney for
Hidalgo County; BARRY JOHNSON, Criminal
District Attorney for McLennan County; SHAREN
WILSON, Criminal District Attorney for Tarrant

No. 1:20-cv-323-LY

County; and BRIAN MIDDLETON, Criminal
District Attorney for Fort Bend County,

      Defendants.

## SECOND AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

### INTRODUCTION

1.     This is a constitutional challenge under 42 U.S.C. § 1983 to an interpretation by the Texas Attorney General of Governor Greg Abbott's March 22, 2020, Executive Order GA 09, "Relating to hospital capacity during the COVID-19 disaster" ("the Executive Order"), as applied to abortion, and to the extent that interpretation is consistent with the Executive Order, a challenge to the order itself. The Texas Attorney General's interpretation is attached as Exhibit A. The Executive Order is attached as Exhibit B. This lawsuit also challenges the Texas Medical Board's emergency amendment to 22 TAC § 187.57 ("Emergency Rule"), which imposes the same requirements as the Executive Order. The Emergency Rule is attached as Exhibit C.

2.     Citing the ongoing COVID-19 pandemic and the need to preserve hospital capacity and personal protective equipment ("PPE"), the Executive Order prohibits all surgeries and procedures that—as determined by a patient's physician—are not immediately medically necessary to correct a serious medical condition of, or to preserve the life of, a patient who without immediate receipt of such care would be at risk for serious adverse medical consequences or death. It applies to all licensed health care practitioners and all licensed health care facilities in Texas. The Executive Order directs regulated parties to stop performing all covered services, with the exception of procedures that, if performed using the commonly accepted standard of clinical

2

practice, would not deplete the hospital capacity or the PPE needed to cope with the COVID-19 disaster.

3.      The Executive Order took effect the afternoon of March 22, 2020, and will remain in effect until at least April 21, 2020.

4.      As the American College of Obstetricians and Gynecologists ("ACOG") has recognized, abortion care is essential care because it cannot be delayed without risking the health and safety of the patient. Accordingly, Plaintiffs believe that providing this care is entirely consistent with the Governor's Executive Order.

5.      However, on March 23, 2020, Texas Attorney General Ken Paxton issued a press release singling out abortion providers and suggesting that he believed provision of non-emergency abortions would violate the Executive Order. The release stated that "[t]hose who violate the governor's order will be met with the full force of the law" and threatened criminal penalties, including jail time.

6.      By stating that the Executive Order applies to "*any type* of abortion," the Attorney General's news release suggests it even prohibits medication abortion, which involves only taking medications by mouth and is not "surgery" or a "procedure" that falls within the terms of the Executive Order. *See id.* (emphasis added). This appears to be the only oral medication targeted in this manner.

7.      For nearly fifty years, the U.S. Supreme Court has recognized the fundamental federal constitutional right to make the profoundly personal decision whether to terminate a pregnancy. *See Roe v. Wade*, 410 U.S. 113 (1973). The Supreme Court has repeatedly recognized that this right is foundational to equality and to respect for the dignity, autonomy, and bodily

integrity of all people. The "central principle" of *Roe* is that "[b]efore viability, the State's interests are not strong enough to support a prohibition on abortion," *Planned Parenthood of Se. Pennsylvania v. Casey*, 505 U.S. 833, 846, 871 (1992), regardless whether that prohibition contains an exception to preserve the life or health of the pregnant woman.

8.     The Texas Attorney General's enforcement threats are a blatant effort to exploit a public health crisis to advance an extreme, anti-abortion agenda, without any benefit to the state in terms of preventing or resolving shortages of PPE or hospital capacity. As a result of these threats, this week Plaintiffs have already been forced to turn away patients in need of time-sensitive care.

9.     Without injunctive relief, Plaintiffs will be forced to continue turning away patients seeking abortion care. At a minimum, those patients will not be able to obtain an abortion for weeks or even months, given that the COVID-19 pandemic is likely to last far beyond the order's stated expiration date. Some will not be able to access abortion at all and will be forced to carry pregnancies to term. Not only will these patients be deprived of their constitutional right to essential healthcare and self-determination, but forcing them to continue their pregnancies will in fact impose far greater strains on an already-taxed healthcare system, as prenatal care and delivery involve much greater exhaustion of hospital health care services and PPE than abortions. All will be delayed in getting the abortion care they are seeking, with attendant risks to their health, wellbeing, and economic security. This violates Plaintiffs' patients' fundamental constitutional right to decide whether to have an abortion prior to viability.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343.

4

11.     Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, Rules 57 and 65 of the Federal Rules of Civil Procedure, and the general legal and equitable powers of this Court.

12.     Venue is appropriate under 28 U.S.C § 1391(b) because one or more of the Defendants resides in this judicial district and because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district.

## PLAINTIFFS

13.     Plaintiff Planned Parenthood Center for Choice ("PP Houston"), a Texas not-for-profit corporation headquartered in Houston, operates a licensed ambulatory surgical center in Houston and a licensed abortion facility in Stafford. PP Houston and its predecessor organizations have provided abortions in Houston and southeast Texas since 1973. PP Houston provides a range of reproductive health services, including medication and procedural abortions. PP Houston sues on behalf of itself, its staff, physicians, nurses, and patients.

14.     Plaintiff Planned Parenthood of Greater Texas Surgical Health Services ("PPGT Surgical Health Services") is a Texas not-for-profit corporation, headquartered in Dallas. PPGT Surgical Health Services and its predecessor organizations have provided high-quality reproductive health care in Texas for decades. PPGT Surgical Health Services operates licensed ambulatory surgical centers in Austin, Dallas, and Fort Worth, and licensed abortion facilities in Waco and Austin. PPGT Surgical Health Services provides a range of reproductive health services, including medication and procedural abortions. PPGT Surgical Health Services sues on behalf of itself, its staff, physicians, nurses, and patients.

15.     Plaintiff Planned Parenthood South Texas Surgical Center ("PPST Surgical Center"), a not-for-profit corporation headquartered in San Antonio, operates a licensed ambulatory surgical center and a licensed abortion facility in San Antonio. PPST Surgical Center provides a range of reproductive health services, including medication and procedural abortions. PPST Surgical Center sues on behalf of itself, its staff, physicians, nurses, and patients.

16.     Plaintiff Whole Woman's Health operates licensed abortion facilities in Fort Worth and McAllen. Whole Woman's Health provides a range of reproductive health services, including medication and procedural abortions. Whole Woman's Health sues on behalf of itself, its staff, physicians, nurses, and patients.

17.     Plaintiff Whole Woman's Health Alliance is a Texas not-for-profit corporation. Its mission is to provide abortion care in underserved communities and shift the stigma around abortion in our culture. It operates a licensed abortion facility in Austin that provides both medication and procedural abortions. Whole Woman's Health Alliance sues on behalf of itself, its staff, physicians, nurses, and patients.

18.     Plaintiff Southwestern Women's Surgery Center ("Southwestern") operates a licensed ambulatory surgical center in Dallas. Southwestern provides a range of reproductive health services, including medication and procedural abortions. Southwestern sues on behalf of itself, its staff, physicians, nurses, and patients.

19.     Plaintiff Robin Wallace, M.D. is co-medical director at Southwestern. Dr. Wallace is a board-certified family medicine physician who provides abortion care. Dr. Wallace sues on her own behalf and on behalf of her patients.

6

20.     Plaintiff Brookside Women's Medical Center PA d/b/a Brookside Women's Health Center and Austin Women's Health Center ("Austin Women's") operates a licensed abortion facility in Austin. Austin Women's provides a range of reproductive health services, including medication and procedural abortions. Austin Women's sues on behalf of itself, its staff, physicians, nurses, advanced practice registered nurses, and patients.

21.     Plaintiff Houston Women's Clinic operates a licensed abortion facility in Houston. Houston Women's Clinic provides a range of reproductive health services, including medication and procedural abortions. Houston Women's Clinic sues on behalf of itself, its staff, and its patients.

22.     Plaintiff Alamo City Surgery Center PLLC d/b/a Alamo Women's Reproductive Services ("Alamo") operates a licensed ambulatory surgical center in San Antonio. Alamo provides a range of reproductive health services, including medication and procedural abortions. Alamo sues on behalf of itself, its staff, and its patients.

23.     Plaintiff Houston Women's Reproductive Services ("HWRS") operates a licensed abortion facility in Houston. HWRS provides medication abortion services. HWRS sues on behalf of itself, its staff, and its patients.

### DEFENDANTS

24.     Defendant Greg Abbott is the Governor of Texas and the author of the Executive Order, which he issued pursuant to his emergency authority.[1] He is sued in his official capacity and may be served with process at 1100 San Jacinto Blvd., Austin, Texas 78701.

---

[1] Tex. Gov't Code § 418.012.

7

25.     Defendant Ken Paxton is the Attorney General of Texas. He is empowered to assist county and district attorneys in the prosecution of criminal offenses,[2] including criminal violations of the Executive Order. He authored the challenged legal interpretation of the Executive Order. He is sued in his official capacity and may be served with process at 300 West 15th Street, Austin, Texas 78701.

26.     Defendant Phil Wilson is the Acting Executive Commissioner of the Texas Health and Human Services Commission ("HHSC"). HHSC is authorized to enforce violations of the Executive Order administratively.[3] As Executive Commissioner, Mr. Wilson has general supervision and control over all matters relating to the health of the people of Texas.[4] He is sued in his official capacity and may be served with process at 4900 N. Lamar Blvd., Austin, TX 78751.

27.     Defendant Stephen Brint Carlton is the Executive Director of the Texas Medical Board ("TMB"). TMB is authorized to enforce violations of the Executive Order using administrative action against physicians and physician assistants licensed in Texas.[5] TMB has implemented the Executive Order through its Emergency Rule. As Executive Director, Mr. Carlton serves as the chief executive and administrative officer of the Board.[6] He is sued in his official capacity and may be served with process at 333 Guadalupe, Tower 3, Suite 610, Austin, TX 78701.

28.     Defendant Katherine A. Thomas is the Executive Director of the Texas Board of Nursing ("TBN"). TBN is authorized to enforce violations of the Executive Order using

---

[2] *Id.* § 402.028.

[3] Tex. Health & Safety Code §§ 243.0115, 245.012(c); 25 Tex. Admin. Code §§ 135.24(a)(1)(F), 139.32(b)(6); Tex. Gov't Code § 531.02011(2) (transferring all "regulatory functions . . . of the Department of State Health Services" to HHSC).

[4] Tex. Health & Safety Code Ann. § 12.001(a).

[5] Tex. Occ. Code § 164.051; 22 Tex. Admin. Code § 185.17(11).

[6] Tex. Occ. Code § 152.051.

8

administrative action against nurses licensed in Texas.[7] As Executive Director, Ms. Thomas performs duties as required by Chapter 301 or designated by the board.[8] She is sued in her official capacity and may be served with process at 333 Guadalupe, Suite 3-460, Austin, TX 78701-3944.

29.    Defendant Margaret Moore is the District Attorney for Travis County. She is responsible for prosecuting criminal violations of the Executive Order occurring in Travis County. She is sued in her official capacity and may be served with process at 509 West 11th Street, Room 300, Austin, Texas 78701.

30.    Defendant Joe Gonzales is the Criminal District Attorney for Bexar County. He is responsible for prosecuting criminal violations of the Executive Order occurring in Bexar County. He is sued in his official capacity and may be served with process at 101 West Nueva Street, 4th Floor, San Antonio, Texas 78205.

31.    Defendant John Creuzot is the District Attorney for Dallas County. He is responsible for prosecuting criminal violations of the Executive Order occurring in Dallas County. He is sued in his official capacity and may be served with process at 133 North Riverfront Boulevard, LB 19, Dallas, Texas 75207.

32.    Defendant Jaime Esparza is the District Attorney for El Paso County. He is responsible for prosecuting criminal violations of the Executive Order occurring in El Paso County. He is sued in his official capacity and may be served with process at El Paso County Courthouse, 500 East San Antonio Avenue, Room 201, El Paso, Texas 79901.

---

[7] *Id.* § 301.452.
[8] *Id.* § 301.101.

33.     Defendant Kim Ogg is the Criminal District Attorney for Harris County. She is responsible for prosecuting criminal violations of the Executive Order occurring in Harris County. She is sued in her official capacity and may be served with process at 1201 Franklin Street, Suite 600, Houston, Texas 77002.

34.     Defendant Ricardo Rodriguez, Jr., is the Criminal District Attorney for Hidalgo County. He is responsible for prosecuting criminal violations of the Executive Order occurring in Hidalgo County. He is sued in his official capacity and may be served with process at 100 East Cano, Edinburg, Texas 78539.

35.     Defendant Barry Johnson is the Criminal District Attorney for McLennan County. He is responsible for prosecuting criminal violations of the Executive Order occurring in McLennan County. He is sued in his official capacity and may be served with process at 219 North 6th Street, Suite 200, Waco, Texas 76701.

36.     Defendant Sharen Wilson is the Criminal District Attorney for Tarrant County. She is responsible for prosecuting criminal violations of the Executive Order occurring in Tarrant County. She is sued in her official capacity and may be served with process at the Tim Curry Criminal Justice Center, 401 West Belknap Street, Fort Worth, Texas 76196-0201.

37.     Defendant Brian Middleton is the Criminal District Attorney for Fort Bend County. He is responsible for prosecuting criminal violations of the Executive Order occurring in Fort Bend County. He is sued in his official capacity and may be served with process at 1422 Eugene Heimann Circle, Suite 21004, Richmond, TX 77469.

## FACTUAL ALLEGATIONS

**A. Abortion Generally and As Provided in Texas**

10

38.     Pregnancy is commonly measured from the first day of the pregnant person's last menstrual period ("LMP"). A full-term pregnancy has a duration of approximately forty weeks LMP. In Texas, abortion is almost entirely banned about halfway through pregnancy, at twenty-two weeks LMP.

39.     Up to ten weeks LMP, patients wishing to terminate their pregnancy can choose between medication abortion (where the patient takes pills to end and expel the pregnancy) and abortion by procedure or "procedural abortion," as it is commonly called (where a clinician uses gentle suction, sometimes along with instruments, to empty the patient's uterus). After ten weeks LMP, only procedural abortion is available in Texas.

40.     Medication abortion involves the patient ingesting a combination of two pills: mifepristone and misoprostol. The patient takes the first medication, mifepristone, in the health center and then, typically twenty-four to forty-eight hours later, takes the second medication, misoprostol, at a location of their choosing, most often at home, after which they expel the pregnancy in a manner similar to a miscarriage. While medication abortion is safe and effective up to eleven weeks LMP, Texas law prohibits medication abortion after ten weeks LMP.[9]

41.     Despite sometimes being referred to as "surgical abortion," procedural abortion is not what is commonly understood to be "surgery," as it involves no incisions and no need for general anesthesia. In a procedural abortion, the clinician uses gentle suction from a thin, flexible tube to empty the contents of the patient's uterus. Before inserting the tube through the patient's cervix and into the uterus, the clinician may dilate the cervix using medication and/or small, expandable rods. Beginning around fifteen weeks LMP, clinicians generally must use instruments

---

[9] *See* Tex. Health & Safety Code § 171.063(a)(2).

11

to complete the procedure, a technique called dilation and evacuation ("D&E"). Later in the second

trimester, the clinician may begin cervical dilation the day before the procedure itself.

42.     Both medication abortion and procedural abortion are effective in terminating a

pregnancy. For some patients, however, one method is medically indicated over the other. For

example, a patient may be allergic to one of the medications used in medication abortion, or may

have medical conditions that make procedural abortion relatively more safe.[10] According to the

latest data from the Texas Department of Health and Human Services, in 2017, more than 68

percent of all abortions in the state were procedural abortions.[11]

43.     Legal abortion is one of the safest medical procedures in the United States.[12] The

vast majority of abortions in the United States are provided in an outpatient setting. In comparison,

more than ninety-eight percent of births in the United States take place in a hospital.[13]

Complications from both medication and procedural abortion are rare, and when they occur, they

can usually be managed in an outpatient clinic setting, either at the time of the abortion or in a

follow-up visit. Major complications—defined as complications requiring hospital admission,

surgery, or blood transfusion—occur in less than one-quarter of one percent (0.23%) of abortion

cases: specifically, such complications arise in just 0.31% of medication abortion cases, 0.16% of

---

[10] Nat'l Acads. of Scis. Eng'g & Med., The Safety & Quality of Abortion Care in the United States 8 (2018) ("Few women are medically ineligible for abortion. There are, however, specific contraindications to using mifepristone for a medication abortion or induction.").

[11] Tex. Health & Human Servs., 2017 Induced Terminations of Pregnancy by Post-Fertilization Age and Procedure (2018), https://hhs.texas.gov/about-hhs/records-statistics/data-statistics/itop-statistics. The remaining 0.1% of abortions before eleven weeks LMP had a reported method of "other/not stated."

[12] Nat'l Acads., supra note 10 at 77–78, 162–63.

[13] Marian F. MacDorman et al., Nat'l Ctr. for Health Statistics, NCHS Data Brief No. 144: Trends in Out-of-Hospital Births in the United States, 1990-2012 (2014), https://www.cdc.gov/nchs/products/databriefs/db144.htm.

first-trimester procedural abortion cases, and 0.41% of procedural cases in the second trimester or later.[14] Abortion-related emergency room visits constitute just 0.01% of all emergency room visits in the United States.[15]

44.    Indeed, both medication abortion and procedural abortion are substantially safer than continuing a pregnancy through to childbirth. The risk of death associated with childbirth is approximately fourteen times higher than that associated with abortion,[16] and complications such as hemorrhage are far more likely to occur with childbirth than following an abortion.

45.    Even with an uncomplicated pregnancy in an otherwise healthy individual, carrying a pregnancy to term and giving birth poses serious medical risks and can have long-term medical and physical consequences. For a person with a medical condition caused or exacerbated by pregnancy or for a person who receives a diagnosis of a severe or lethal fetal anomaly, these risks are increased.

46.    People decide to end a pregnancy for a variety of reasons, including familial, medical, financial, and personal reasons. Some people end a pregnancy because they conclude it is not the right time in their lives to have a child; some do so because they already have one or more children and decide they cannot add to their families; some do so to preserve their life, health, or safety; some do so because they receive a diagnosis of a fetal anomaly; some do so because they have become pregnant as a result of rape or incest; and some do so because they choose not to

---

[14] Ushma D. Upadhyay et al., *Incidence of Emergency Department Visits and Complications After Abortion*, 125 Obstetrics & Gynecology 175 (2015).

[15] Ushma D. Upadhyay et al., *Abortion-related Emergency Room Visits in the United States: An Analysis of a National Emergency Room Sample*, 16(1) BMC Med. 1, 1 (2018).

[16] Nat'l Acads., *supra* note 10 at 11, 74–75.

13

have biological children. Approximately one in four women in this country will have an abortion by age forty-five.

47.     Plaintiffs provide medication abortion, procedural abortion, or both medication and procedural abortion. Plaintiffs provide medication abortion up to ten weeks LMP. Plaintiffs provide procedural abortion to varying gestational points in pregnancy within the bounds of Texas law, which prohibits abortion care except in narrow circumstances at or after twenty-two weeks LMP.[17]

**B. The COVID-19 Pandemic**

45.     Since first identified in December 2019,[18] COVID-19 has grown to a worldwide pandemic. The disease has spread to 195 countries, infecting hundreds of thousands of people and killing more than 16,000.[19] In the United States, the virus has reached every state, including nearly 1,000 confirmed cases and twelve deaths in Texas as of the time of filing.[20] Federal and state officials and medical professionals expect a surge of infections—which may last for a year or

---

[17] Texas Health & Safety Code section 171.044 prohibits abortion when "the probable post-fertilization age of the unborn child is 20 or more weeks." "Post-fertilization age" means "the age of the unborn child as calculated from the fusion of a human spermatozoon with a human ovum," *id.* § 171.042, which occurs approximately two weeks after the first day of a patient's last menstrual period. Thus, twenty weeks post-fertilization is twenty-two weeks LMP.

[18] Derrick Bryson Taylor, *A Timeline of the Coronavirus Pandemic*, N.Y. Times (updated Mar. 24, 2020), https://www.nytimes.com/article/coronavirus-timeline.html.

[19] World Health Org., Coronavirus Disease (COVID-19) Pandemic, https://www.who.int/emergencies/diseases/novel-coronavirus-2019 (last viewed Mar. 24, 2020).

[20] Tex. Dep't of State Health Servs., *Texas Case Counts: COVID-19* (last updated Mar. 24, 2020), https://txdshs.maps.arcgis.com/apps/opsdashboard/index.html#/ed483ecd702b4298ab01e8b9cafc8b83.

eighteen months[21]—to test the limits of the healthcare system.[22] Healthcare workers are facing a shortage of certain types of PPE, particularly N95 masks.[23]

46.     On March 13, 2020, the White House issued a proclamation declaring that the COVID-19 outbreak in the United States constitutes a national emergency. That same day, Governor Abbott issued a disaster declaration certifying that COVID-19 poses an imminent threat of disaster for all counties in Texas.

47.     On March 18, 2020, a group of preeminent national medical organizations issued a joint statement on "Abortion Access During the COVID-19 Outbreak."[24] That guidance instructs that "[t]o the extent that hospital systems or ambulatory surgical facilities are categorizing procedures that can be delayed during the COVID-19 pandemic, abortion should not be categorized as such a procedure" because it "is an essential component of comprehensive health care" and "a time-sensitive service for which a delay of several weeks, or in some cases days, may increase the risks [to patients] or potentially make it completely inaccessible."

---

[21] Denise Grady, *Not His First Epidemic: Dr. Anthony Fauci Sticks to the Facts*, N.Y. Times (Mar. 8, 2020), https://www.nytimes.com/2020/03/08/health/fauci-coronavirus.html.

[22] Ctrs. for Disease Control & Prevention, *Interim Guidance for Healthcare Facilities: Preparing for Community Transmission of COVID-19 in the United States*, (last updated Feb. 29, 2020), https://www.cdc.gov/coronavirus/2019-ncov/healthcare-facilities/guidance-hcf.html

[23] Andrew Jacobs, Matt Richtel & Mike Baker, *'At War With No Ammo': Doctors Say Shortage of Protective Gear Is Dire*, N.Y. Times (Mar. 19, 2020), https://www.nytimes.com/2020/03/19/health/coronavirus-masks-shortage.html.

[24] The medical organizations issuing this joint guidance were ACOG, the American Board of Obstetrics & Gynecology, the American Association of Gynecologic Laparoscopists, the American Gynecological & Obstetrical Society, the American Society for Reproductive Medicine, the Society for Academic Specialists in General Obstetrics and Gynecology, the Society of Family Planning, and the Society for Maternal-Fetal Medicine.

48.     On March 19, 2020, the Texas Department of State Health Services ("DSHS") determined that COVID-19 constitutes a public health disaster within the meaning of Chapter 81 of the Texas Health and Safety Code.

49.     On March 21, 2020, the Texas Medical Board ("TMB") issued guidance to its licensees—all physicians licensed in the state of Texas—regarding the scheduling of elective surgeries and procedures in light of Governor Abbott's COVID-19 disaster declaration. Consistent with guidance from the Centers for Disease Control and Prevention ("CDC"), TMB recommended that licensees "postpone all non-urgent elective surgeries and procedures in inpatient and outpatient settings."[25] TMB explained that postponing non-urgent elective cases would preserve PPE, ventilator availability, ICU beds, and "significant healthcare practitioner time."

50.     As further guidance, TMB clarified that "elective, non-urgent cases" are cases where "there is no anticipated short-term nor long-term negative impact because of delaying a procedure or surgery," such as "screening for a chronic condition or most cosmetic procedures." By contrast, TMB defined "urgent or elective urgent" procedures as those where "there is a risk of patient deterioration or disease progression likely to occur if the procedure is not undertaken or is significantly delayed." Significantly, TMB stressed that for these cases, "[t]he resulting decline in [the patient's] health could make them more vulnerable to COVID-19 and other issues." TMB categorized as "emergent" those cases where the patient would suffer a life-threatening condition

---

[25] Tex. Med. Bd., Texas Medical Board (TMB) Guidance on the Scheduling of Non-Urgent Elective Surgeries and Procedures During Texas Disaster Declaration for COVID-19 Pandemic (Mar. 21, 2020), *available at* http://www.tmb.state.tx.us/idl/05863196-2EC6-BE0E-3036-910D363B6C25.

if the procedure were not undertaken or cases that cannot be safely delayed for any significant period of time.

51.     Plaintiffs are committed to responding to the current public health crisis, including by preserving much-needed medical resources that are in short supply during the pandemic. Since the onset of the COVID-19 outbreak Plaintiffs have taken precautions to maximize the safety of their patients and staff and to conserve PPE. For example, they have begun screening patients for COVID-19 symptoms before each visit. They have reduced patient volume and/or increased appointment spacing between patients to comply with social-distancing precautions. They have begun requiring patients to wait in their cars rather than in the waiting room after checking in for an appointment. They have postponed or cancelled non-essential procedures that require health care staff to use PPE, such as masks. For procedural abortions and other essential medical procedures, they have reduced use of PPE as much as possible.

52.     Plaintiffs do not provide inpatient care and are not equipped to do so.

53.     Abortion does not require extensive use of PPE. Providing patients with pills for medication abortion does not require the use of *any* PPE.

54.     While clinicians use some PPE for procedural abortion—such as gloves, a surgical mask, and protective eyewear—only a small number of health care staff are physically present for these procedures or their preparation/recovery and therefore in need of PPE. Plaintiffs generally do not use N95 respirators, the PPE in shortest supply during the COVID-19 pandemic, and only do so to protect patients and staff from potential COVID-19 transmission. In Plaintiffs'

communities there does not appear to be a shortage of the non-sterile gloves Plaintiffs use for procedural abortions and exams.[26]

55.     The COVID-19 pandemic and its fallout do not reduce patients' needs for abortion; if anything, they make timely access to abortion even more urgent, while raising additional obstacles for patients seeking that care.

56.     While much is unknown about COVID-19, including whether it can complicate pregnancy, some pregnant people who are delayed in accessing abortion may be exposed to additional health risks from the disease. ACOG has warned that "pregnant women are known to be at greater risk of severe morbidity and mortality from other respiratory infections such as influenza and SARS-CoV. As such, pregnant women should be considered an at-risk population for COVID-19."[27]

57.     Meanwhile, Texas legal restrictions on abortion, which are some of the harshest in the country, impose burdens that weigh even more heavily during the current pandemic and that also undermine Defendants' stated goal of preserving PPE. For example, Texas law requires most patients to make at least two in-person appointments for an abortion, even though most patients

---

[26] U.S. Food & Drug Admin., Medical Glove Conservation Strategies: Letter to Health Care Providers (last updated Mar. 20, 2020), *available at* https://www.fda.gov/medical-devices/letters-health-care-providers/medical-glove-conservation-strategies-letter-health-care-providers (referring to a potential shortage but that the FDA is monitoring for any widespread shortages); U.S. Food & Drug Admin., FAQs on Shortages of Medical Gloves (last updated Mar. 20, 2020), *available at* https://www.fda.gov/medical-devices/personal-protective-equipment-infection-control/faqs-shortages-medical-gloves (not noting a shortage of medical gloves at this time, but acknowledging demand could exceed supply, which the FDA is monitoring).

[27] ACOG, Practice Advisory - Novel Coronavirus 2019 (COVID-19) (March 13, 2020), https://www.acog.org/clinical/clinical-guidance/practice-advisory/articles/2020/03/novel-coronavirus-2019; *see also* Ctrs. for Disease Control & Prevention, *Information for Healthcare Providers:   COVID-19   and   Pregnant   Women* (Mar.   16,   2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/pregnant-women-faq.html.

could obtain care just as safely in one visit.[28] Texas law also mandates medically unnecessary ultrasounds,[29] as well as in-person follow-up visits that could safely be provided through telemedicine.[30] Texas law unnecessarily restricts medication abortion to ten weeks when it can safely be provided through eleven weeks, thereby eliminating an evidence-based method to reduce the need for abortion by procedure.[31] And minor patients, unless emancipated, must obtain either written consent from a parent or a judicial order before they can receive care.[32] During the COVID-19 pandemic, patients must navigate these barriers against the backdrop of job insecurity, minimal public transit availability, and limited childcare assistance due to mandatory social-distancing and shelter-in-place orders.

58.     In addition to all other harms, the pandemic has caused layoffs and other work disruptions, and has shuttered schools and childcare facilities. Unemployment claims are soaring.[33]

---

[28] Tex. Health & Safety Code § 171.012 (mandating that patients receive an ultrasound at least twenty-four hours before an abortion procedure).

[29] *Id.*

[30] Tex. Health & Safety Code § 171.063(e); 25 Tex. Admin Code § 139.53(b)(4). Indeed, to respond to the pandemic, the state has suspended restrictions on telemedicine generally, 28 Tex. Admin. Code § 35.1 (emergency regulation adopted Mar. 17, 2020); Tex. Med. Bd., Texas Medical Board (TMB) Frequently Asked Questions (FAQs) Regarding Telemedicine During Texas Disaster Declaration for COVID-19 Pandemic (Mar. 19, 2020), http://www.tmb.state.tx.us/idl/A2936385-466D-15D1-0F9E-F486D0491A27, and could suspend the existing restrictions barring Plaintiffs from using telemedicine to provide medication abortion and post-abortion follow-up care. Tex. Occ. Code § 111.005(c); Tex. Health & Safety Code § 171.063(e); 25 Tex. Admin Code § 139.53(b)(4).

[31] Tex. Health & Safety Code § 171.063(a)(2)

[32] Tex. Family Code § 33.003.

[33] Chris Costa, *Texas Workforce Commission encourages employers to use 'Shared Work' program instead of layoffs due to COVID-19*, KHOU.com (last updated March 22, 2020), https://www.khou.com/article/news/health/coronavirus/texas-workforce-commission-encourages-employers-to-use-shared-work-program-instead-of-layoffs-due-to-covid-19/285-cdd5527b-7764-4806-af5d-9509f660ef9d ("The Texas Workforce Commission was overwhelmed by thousands of Texans are applying for unemployment benefits because of layoffs and reduced hours due to COVID-19.").

People who receive health insurance through their employers are being laid off and left without insurance coverage for themselves and their families. Other workers are remaining on the job despite symptoms and increasingly dire public health warnings, fearing the loss of work even more than the disease.

59.    As trusted healthcare providers, Plaintiffs understand their responsibility to be there when their patients need them most.

**C. The Governor's and Attorney General's Threats to Abortion Access**

60.    On March 22, 2020, Governor Abbott issued Executive Order GA 09, barring "all surgeries and procedures that are not immediately medically necessary to correct a serious medical condition of, or to preserve the life of, a patient who without immediate performance of the surgery or procedure would be at risk for serious adverse medical consequences or death, as determined by the patient's physician." The Order states that it is responding to the fact that "hospital capacity and personal protective equipment are being depleted by surgeries and procedures that are not medically necessary to correct a serious medical condition or to preserve the life of a patient," and it exempts "any procedure that, if performed in accordance with the commonly accepted standard of clinical practice, would not deplete the hospital capacity or the personal protective equipment needed to cope with the COVID-19 disaster." *See* Ex. B.

61.    Although the order does not define "personal protective equipment," Plaintiffs understand that term to refer to, for example, surgical masks, sterile and non-sterile gloves, disposable protective eyewear, disposable gowns, and disposable shoe covers. Plaintiffs also understand that term to refer to N95 respirators.

20

62.     Failure to comply with the Executive Order is a criminal offense punishable by a fine of up to $1,000, confinement in jail for up to 180 days, or both fine and confinement. *See* Ex. B. These criminal penalties may in turn trigger administrative enforcement by the Texas Health and Human Services Commission, the Texas Medical Board, and the Texas Board of Nursing, which are authorized to pursue disciplinary action against licensees who violate criminal laws.[34]

63.     To implement the Executive Order, Plaintiffs promptly developed internal policies identifying the relevant factors physicians must consider when making a determination whether a procedure would be permissible under the Order. Those considerations included not only the text of the Order itself, but also the guidance of trusted national medical organizations, which highlight that abortion is a time-sensitive procedure for which delay would cause harm to the patient.

64.     On March 23, 2020, the Texas Attorney General issued a press release titled "Health Care Professionals and Facilities, Including Abortion Providers, Must Immediately Stop All Medically Unnecessary Surgeries and Procedures to Preserve Resources to Fight Covid-19 Pandemic." This press release singled out abortion providers multiple times. It suggested that the Attorney General interprets the Executive Order, contrary to its plain language, as prohibiting the provision of non-emergency abortions and warned that "[t]hose who violate the governor's order will be met with the full force of the law." *See* Ex. A.

65.     Because medication abortion involves only taking medications by mouth it is not a "surgery" or "procedure" that falls within the terms of the Executive Order. However, by stating that the Executive Order applies to "*any type* of abortion," the Attorney General's news release

---

[34] 25 Tex. Admin. Code § 139.32(b)(6); 25 Tex. Admin. Code § 135.24(a)(1)(F); Tex. Occ. Code § 164.051(a)(2)(B), (a)(6); 22 Tex. Admin. Code § 185.17(11); Tex. Occ. Code Ann. § 301.452(b)(3), (B)(10).

suggests that the Attorney General interprets the Executive Order contrary to its plain language as prohibiting medication abortion. *See id.* (emphasis added).

66.     On March 24, 2020, the TMB adopted an emergency rule to enforce the Executive Order. Under preexisting law, the TMB can temporarily suspend or restrict a physician's license if the physician's "continuation in practice would constitute a continuing threat to the public welfare."[35] The Emergency Rule expands this basis for discipline to include "performance of a non-urgent elective surgery or procedure," and incorporates the terms of the Executive Order, requiring all licensed health care professionals to postpone all surgeries and procedures that are not immediately necessary.[36]

67.     If the Executive Order is enforced, as interpreted by the Attorney General (contrary to its plain language), to apply to both procedural abortion and medication abortion, it effectively bans abortion in Texas for the duration of the COVID-19 public health emergency. Given the enforcement threat sparked by the Attorney General's press release and the criminal and other penalties specified in the Executive Order, Plaintiffs, their physicians, nurses, and staff have been and will continue to be forced to cancel scheduled appointments. They must stop providing all non-emergency abortion care that uses PPE or subject themselves to risk of criminal prosecution or other penalties.

68.     If the Executive Order is understood (consistent with its plain language) as not applying to medication abortion, which is provided through medications by mouth and not a "procedure," it will still effectively outlaw abortion after ten weeks of pregnancy. This

---

[35] 22 Tex. Admin. Code § 187.57(b).
[36] 22 Tex. Admin. Code § 187.57 (emergency regulation adopted Mar. 23, 2020), *available at* https://tinyurl.com/v4pz99u.

interpretation of the Executive Order, allowing medication abortion but not procedural abortion, still operates as a ban for those patients who would otherwise obtain a procedural abortion—that is, all those who are ten or more weeks pregnant and those with earlier pregnancies for whom medication abortion is not appropriate.

69.     Under either interpretation, the Executive Order will deprive Plaintiffs' patients of the freedom to make a very personal decision in consultation with their medical providers, which is all the more weighty given the increased health risks to pregnant persons during the COVID-19 pandemic. It will harm patients' physical, emotional, and financial wellbeing and the wellbeing of their families. Patients' abortions will be delayed, and in some cases, denied altogether. As a result, Texas patients will be forced to carry pregnancies to term, resulting in a deprivation of their fundamental right to determine when and whether to have a child or to add to their existing families.

70.     If a person is forced to continue a pregnancy against their will, particularly during a global pandemic, it can pose a risk to their physical, mental, and emotional health, as well as to the stability and wellbeing of their family, including their existing children. Pregnancy, childbirth, and an additional child may exacerbate an already difficult situation for those who have suffered trauma, such as sexual assault or domestic violence. And research has found that women denied an abortion were four times more likely than women who received an abortion to experience economic hardship and insecurity lasting for years, with serious consequences for those women and their families. As a result of the COVID-19 pandemic, unemployment rates are soaring, meaning that families are losing not only their income but in many cases their employer-provided

health insurance; the medical and economic hardships of pregnancy and childrearing, for many families, is thus more acute now than ever.

71.     Delaying abortion poses risks to patients, too. Although abortion is significantly safer than continuing pregnancy through childbirth, the risks associated with abortion increase as pregnancy advances. And carrying an unwanted pregnancy burdens patients physically, emotionally, psychologically, and financially. Finally, in Texas, as in many other states, legal restrictions make abortion harder to access with each passing week—and almost entirely unlawful at or after twenty-two weeks LMP. As ACOG and other well-respected medical professional organizations have observed, abortion is "a time-sensitive service for which a delay of several weeks, or in some cases days, may increase the risks [to patients] or potentially make it completely inaccessible."[37] For these reasons, abortion is an especially urgent medical treatment during the COVID-19 pandemic.

72.     Patients generally seek abortion as soon as they are able, but many face financial and logistical obstacles that can delay their access to abortion. For example, low-wage workers often have no paid time off or sick leave, so even if a pregnant worker is able to get time off work for an abortion appointment, they will likely have to forgo part of a paycheck. Patients facing long travel distances typically must arrange and pay for transportation and arrange to take time off work. Many patients must also arrange and pay for childcare while they travel to their abortion appointment. These barriers routinely delay abortion access for people with low incomes, including delay past the point in pregnancy when medication abortion is no longer available, and

---

[37] ACOG et al., *Joint Statement on Abortion Access During the COVID-19 Outbreak* (Mar. 18,     2020),     https://www.acog.org/news/news-releases/2020/03/joint-statement-on-abortion -access-during-the-covid-19-outbreak.

for some, to the point that a more complex, two-day procedure is required. Although abortion is safe throughout pregnancy, the risk, complexity, duration, and thus cost increase as pregnancy progresses. As a result, patients who are delayed in obtaining care as they save money for the procedure may find that even more money is needed for the delayed procedure, necessitating even more delay.

73.     The Executive Order will remain in force until April 21, 2020, at the earliest. It is subject to extension for the duration of the coronavirus pandemic, which experts believe will last at least one year to eighteen months, if not more.[38] The current shortage of PPE is expected to continue for months.[39] As a result, the Attorney General's interpretation of the Executive Order threatens to ban abortion for all Texans who are currently pregnant or who will become pregnant in the coming months.

## CLAIMS FOR RELIEF

### COUNT I
(Substantive Due Process)

74.     Plaintiffs reallege and incorporate by reference the allegations contained above.

75.     By banning all non-emergency abortion prior to viability, or alternatively by banning non-emergency abortion after ten weeks of pregnancy and allowing no exception for patients prior to ten weeks of pregnancy for whom medication abortion is contraindicated, the Executive Order and corresponding Attorney General interpretation and the Emergency Rule, as applied to abortion, violate the right to substantive due process.

---

[38] *See* Grady, *supra* note 21.
[39] Ctrs. for Disease Control & Prevention, *Healthcare Supply of Personal Protective Equipment*, (last updated Mar. 14, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/healthcare-supply-ppe.html

76.     Unless enjoined, the Executive Order and corresponding Attorney General interpretation and the Emergency Rule will subject Plaintiffs' patients to irreparable harm for which no adequate remedy at law exists by preventing patients from or significantly delaying them in obtaining an abortion in Texas, thereby causing them to suffer significant constitutional, medical, emotional, and other harm.

COUNT 2<br>(Equal Protection)

77.     Plaintiffs reallege and incorporate by reference the allegations contained above.

78.     By selectively burdening patients' fundamental right to abortion without justification and singling abortion providers and their patients out for differential treatment from providers of other medical services and their patients, the Executive Order and corresponding Attorney General interpretation and the Emergency Rule, as enforced, violate Texans' right to equal protection guaranteed by the Fourteenth Amendment to the U.S. Constitution.

79.     Unless enjoined, the Executive Order and corresponding Attorney General interpretation and the Emergency Rule will subject Plaintiffs and their patients to irreparable harm for which no adequate remedy at law exists by preventing patients from or significantly delaying them in obtaining an abortion in Texas, thereby causing them to suffer significant constitutional, medical, emotional, and other harm.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs ask this Court:

A.     To immediately issue a temporary restraining order, followed by a preliminary injunction, and ultimately a permanent injunction, restraining Defendants, their officers, agents, servants, employees, and attorneys, and any persons in active concert or participation with them,

from enforcing or complying with the Executive Order and corresponding Attorney General interpretation and the Emergency Rule, as applied to abortion;

       B.      To enter a judgment declaring that the Executive Order and corresponding Attorney General interpretation and Emergency Rule, as applied to abortion, violate the Fourteenth Amendment to the U.S. Constitution;

       C.      To award Plaintiffs their attorneys' fees and costs pursuant to 42 U.S.C. § 1988, and

       D.      To grant such other and further relief as the Court deems just and proper.

Dated: April 17, 2020

Respectfully submitted,

/s/ Patrick J. O'Connell
Patrick J. O'Connell
Texas Bar No. 15179900
Law Offices of Patrick J. O'Connell PLLC
5926 Balcones Dr., Ste. 220
Austin, Texas 78731
(512) 852-5918
pat@pjofca.com

*Attorney for Plaintiffs*

Julie Murray*
Hannah Swanson*
PLANNED PARENTHOOD FEDERATION OF AMERICA
1110 Vermont Ave., NW Ste. 300
Washington, D.C. 20005
(202) 973-4800
julie.murray@ppfa.org
hannah.swanson@ppfa.org

Jennifer Sandman*

27

PLANNED PARENTHOOD FEDERATION OF AMERICA
123 William Street
New York, NY 10038
(212) 541-7800
jennifer.sandman@ppfa.org

*Attorneys for Plaintiffs Planned Parenthood Center for Choice, Planned Parenthood of Greater Texas Surgical Health Services, and Planned Parenthood South Texas Surgical Center*

Molly Duane*
Rabia Muqaddam*
Francesca Cocuzza*
CENTER FOR REPRODUCTIVE RIGHTS
199 Water St., 22nd Floor
New York, NY 10038
(917) 637-3631
mduane@reprorights.org
rmuqaddam@reprorights.org
fcocuzza@reprorights.org

*Attorneys for Plaintiffs Southwestern Women's Surgery Center, Brookside Women's Medical Center PA d/b/a Brookside Women's Health Center and Austin Women's Health Center, Robin Wallace, M.D., Alamo City Surgery Center PLLC d/b/a Alamo Women's Reproductive Services, and Houston Women's Reproductive Services*

Stephanie Toti
Rupali Sharma*
Sneha Shah*
LAWYERING PROJECT
25 Broadway, Fl. 9
New York, NY 10004
(646) 490-1083
stoti@lawyeringproject.org
rsharma@lawyeringproject.org
sshah@lawyeringproject.org

*Attorneys for Plaintiffs Whole Woman's Health and Whole Woman's Health Alliance*

28

Anjali Salvador, TX Bar No. 24110324*
Andre Segura, TX Bar No. 24107112*
ACLU FOUNDATION OF TEXAS, INC.
5225 Katy Freeway, Suite 350
Houston, TX 77007
Tel. (713) 942-8146
Fax: (713) 942-8966
asalvador@aclutx.org
asegura@aclutx.org

Brigitte Amiri*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel. (212) 549-2600
Fax: (212) 549-2652
bamiri@aclu.org

*Attorneys for Plaintiff Houston Women's Clinic*

*admitted pro hac vice*

## CERTIFICATE OF SERVICE

I certify that on this 17th day of April, 2020, a copy of the foregoing was filed with

this Court's CM/ECF system, which will serve a copy on the following individuals:

Heather Gebelin Hacker
Andrew Bowman Stephens
Benjamin S. Walton
Office of the Attorney General of Texas
209 W. 14th Street
7th Floor
Austin, TX 78701
512-836-2540
512-474-2697 (fax)
heather.hacker@oag.texas.gov
andrew.stephens@oag.texas.gov
benjamin.walton@oag.texas.gov

John J. Butrus, Jr.
Dallas County District Attorney's Office
133 N. Riverfront Blvd LB 19
Dallas, TX 75207
(214) 653-3691
(214) 653-2899 (fax)
john.butrus@dallascounty.org

Justin C. Pfeiffer
Fort Bend County Attorney's
Office 401 Jackson Street
Third Floor
Richmond, TX 77469
(281) 341-4555
281-341-4557 (fax)
justin.pfeiffer@fortbendcountytx.gov

David S. Lill
Lill Firm, P.C.
4407 Bee Caves Road
Suite 111 Building 1
Austin, TX 78746
(512) 330 0252
844 402 9814 (fax)
david@lillfirm.com

Elizabeth Murrill
Louisiana Dept. of Justice
1885 North Third Street
Baton Rouge, LA 70804
225-456-7544
murrille@ag.louisiana.gov

*/s/ Patrick J. O'Connell*
Patrick J. O'Connell

30