**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

PLANNED PARENTHOOD CENTER FOR
CHOICE, *et al*.,

      Plaintiffs,

      v.

GREG ABBOTT, in his official capacity as
Governor of Texas, *et al*.,

      Defendants.

No. 1:20-cv-00323-LY

### <u>SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION</u>

## TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................ iii

INTRODUCTION ............................................................................................................. 1

STATEMENT OF FACTS ................................................................................................ 2

    A.   Provision of Abortion Care in Texas. ................................................................. 2

    B.   Burdens on Abortion Access Imposed by the Executive Orders. ...................... 3

        1.   Increased health risks. ................................................................................ 4

        2.   Physical discomfort, emotional distress, and loss of privacy. ................... 5

        3.   Travel-related burdens. .............................................................................. 5

        4.   Economic costs. .......................................................................................... 6

        5.   Forced childbirth. ....................................................................................... 7

        6.   Increased risks of abuse. ............................................................................ 8

    C.   Asserted State Interests. .................................................................................... 9

        1.   Conserving PPE during the pandemic. ...................................................... 9

        2.   Conserving hospital capacity during the pandemic. ................................ 12

        3.   Reducing the spread of COVID-19. ......................................................... 12

    D.   Procedural History. .......................................................................................... 13

ARGUMENT .................................................................................................................. 15

I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS. ........................... 15

    A.   The Executive Orders Impose Unconstitutional Burdens on Texas Residents Seeking Medication Abortions. ........................................................................................ 17

    B.   The Executive Orders Impose Unconstitutional Burdens on Texas Residents Seeking Procedural Abortions. .......................................................................................... 19

        1.   Individuals seeking procedural abortions after ten weeks LMP. ............. 20

i

2.   Individuals who will likely be ineligible for aspiration abortion by the time the Executive Orders expire. ........................................................................................... 20

3.   Individuals who will likely be ineligible for a single-day D&E abortion by the time the Executive Orders expire. ..................................................................................... 21

4.   Individuals who will likely be ineligible to have an abortion in a clinic setting by the time the Executive Orders expire. ............................................................................. 21

5.   Individuals who will likely be past the gestational age limit for abortion in Texas by the time the Executive Orders expire. ..................................................................... 22

6.   Patients experiencing IPV and minors who have obtained judicial bypass. ............. 22

C.   Arbitrary and Unreasonable Treatment of Patients Seeking Procedural Abortion. ...... 22

D.   Defendants' Arguments That This Court Lacks Authority to Enter an Injunction Are Meritless. ................................................................................................................... 23

II.   PLAINTIFFS' PATIENTS WILL SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION. ..................................................................................... 24

III.   THE BALANCE OF HARMS AND PUBLIC INTEREST SUPPORT PRELIMINARY INJUNCTIVE RELIEF. ................................................................................................... 25

CONCLUSION ........................................................................................................................ 25

CERTIFICATE OF SERVICE ................................................................................................ 29

# TABLE OF AUTHORITIES

**Cases**

*City of Austin v. Paxton*,
    943 F.3d 993 (5th Cir. 2019) ................................................................. 24

*Deerfield Med. Ctr. v. City of Deerfield Beach*,
    661 F.2d 328 (5th Cir. Unit B Nov. 1981) ............................................ 24

*Elrod v. Burns*,
    427 U.S. 347 (1976) .............................................................................. 24

*Gonzales v. Carhart*,
    550 U.S. 124 (2007) .............................................................................. 16

*In re Abbott*,
    No. 20-50264, 2020 WL 1685929 (5th Cir. Apr. 7, 2020) ........................... *passim*

*In re Abbott*,
    No. 20-50296, 2020 WL 1866010 (5th Cir. Apr. 13, 2020) ................................. 14

*Ingebretsen v. Jackson Pub. Sch. Dist.*,
    88 F.3d 274 (5th Cir. 1996) .................................................................. 25

*Jackson Women's Health Org. v. Currier*,
    760 F.3d 448 (5th Cir. 2014) ......................................................... 15, 25

*Jacobson v. Commonwealth of Massachusetts*,
    197 U.S. 11 (1905) ........................................................................ *passim*

*Janvey v. Alguire*,
    647 F.3d 585 (5th Cir. 2011) ................................................................. 15

*Opulent Life Church v. City of Holly Springs*,
    697 F.3d 279 (5th Cir. 2012) ................................................................ 24

*Planned Parenthood of Ariz., Inc. v. Humble*,
    753 F.3d 905 (9th Cir. 2014) ................................................................ 25

*Planned Parenthood of Cen. Mo. v. Danforth*,
    428 U.S. 52 (1976) ............................................................................... 23

*Planned Parenthood of Kan. & Mid-Mo. v. Andersen*,
    882 F.3d 1205 (10th Cir. 2018) ........................................................... 25

*Planned Parenthood of Se. Pa. v. Casey*,
    505 U.S. 833 (1992) ................................................... 13, 15, 16, 22

*Planned Parenthood of Wis., Inc. v. Van Hollen*,
    738 F.3d 786 (7th Cir. 2013) ............................................................. 25

*Robinson v. Marshall*,
    No. 2:19cv365-MHT, 2020 WL 1659700 (M.D. Ala. Apr. 3, 2020) ................... 23

*Roe v. Wade*,
    410 U.S. 113 (1973) ......................................................................... 15, 16

*Whole Woman's Health v. Hellerstedt*,
    136 S. Ct. 2292 (2016) ........................................................ 15, 16, 18, 22

**Statutes, Regulations, and Rules**

    22 Tex. Admin. Code § 187.57 .................................................................. 1

    Tex. Gov't Code Ann. § 402.028 ............................................................. 24

    Tex. Gov't Code Ann. § 418.012 ............................................................. 24

    Tex. Health & Safety Code § 171.004 ................................................... 3, 21

    Tex. Health & Safety Code § 171.012 ........................................ 4, 10, 17, 21

    Tex. Health & Safety Code § 171.044 ................................................... 3, 22

    Tex. Health & Safety Code § 171.063 ................................................... 2, 11

**Other Authorities**

    Am. Psychological Ass'n, *How COVID-19 May Increase Domestic Violence and Child
    Abuse* (Apr. 8, 2020), https://www.apa.org/topics/covid-19/domestic-violence-
    child-abuse .......................................................................................... 8

    Amanda Taub, *A New Covid-19 Crisis: Domestic Abuse Worldwide*, N.Y. Times (Apr.
    14, 2020), https://www.nytimes.com/2020/04/06/world/coronavirus-domestic-
    violence.html ....................................................................................... 8

    Guttmacher Inst., *Regulating Insurance Coverage of Abortion* (Apr. 1, 2020),
    https://www.guttmacher.org/state-policy/explore/regulating-insurance-coverage-
    abortion. ............................................................................................. 7

    Julie A. Gazmararian et al., *Prevalence of Violence Against Pregnant Women*, 275 JAMA
    1915, 1918 (1996) ................................................................................ 8

## INTRODUCTION

Plaintiffs (collectively, "Providers") submit this supplemental memorandum of law in support of their motion for a preliminary injunction. On April 17, 2020, Governor Greg Abbott issued Executive Order GA-15, "Relating to hospital capacity during the COVID-19 disaster," which supersedes the prior Executive Order as of 11:59 P.M. on April 21, 2020. *See* Ex. 21, attached hereto. Executive Order GA-15 largely incorporates the terms of Executive Order GA-09,[1] which Defendants have interpreted to prohibit virtually all abortion in Texas for the Order's duration. However, GA-15 establishes the following exception:

> any surgery or procedure performed in a licensed health care facility that has certified in writing to the Texas Health and Human Services Commission both: (1) that it will reserve at least 25% of its hospital capacity for treatment of COVID-19 patients, accounting for the range of clinical severity of COVID-l9 patients; and (2) that it will not request any personal protective equipment from any public source, whether federal, state, or local, for the duration of the COVID 19 disaster.

Providers believe that they meet this exception, and therefore that Executive Order GA-15 has no application to them. Providers' licensed health care facilities do not have any hospital capacity, and Providers do not intend to request personal protective equipment ("PPE") from any public source for the duration of the COVID-19 disaster. Providers will submit certifications to the Texas Health and Human Services Commission to that effect.

---

[1] The Texas Medical Board's amendment to 22 Tex. Admin. Code § 187.57 incorporates the terms of GA-09 and remains in effect through July 20, 2020. Plaintiffs' Motion for a Preliminary Injunction challenges that rule together with GA-09. To the extent Defendants intend to interpret and enforce the rule consistent with their interpretation of GA-09 and inconsistent with GA-15's new exception, Plaintiffs maintain their request for a preliminary injunction against that enforcement. Throughout this brief, references to the "Executive Orders" include the rule.

1

Providers have attempted to meet and confer with counsel for Defendants to confirm that their licensed facilities qualify for this exception by emails to Defendants yesterday and today, but do not have a response that clarifies Defendants' position.[2] Accordingly, the need for preliminary injunctive relief persists as long as Defendants continue their efforts to ban nearly all abortions during the COVID-19 pandemic through application of Governor Abbott's March 22, 2020, Executive Order GA-09 and GA-15 (collectively, "Executive Orders"). A preliminary injunction is urgently needed: every day that the Executive Orders prevent Texas residents from obtaining in-state abortion care, Providers, their patients, and the public health suffer irreparable harm.

## STATEMENT OF FACTS[3]

### A.  Provision of Abortion Care in Texas.

Twenty-four outpatient facilities in Texas were providing abortion before the pandemic. White Decl. ¶ 12. Sixteen are licensed abortion facilities ("clinics"), and eight are ambulatory surgical centers ("ASCs"). *Id.* The clinics are located in or near Austin; Dallas; Fort Worth; El Paso; Houston; McAllen; San Antonio; and Waco. *Id.* ¶ 13. Only six of the eight ASCs—those in Austin, Dallas, Houston, and San Antonio—provide abortion after eighteen weeks LMP. *Id.* ¶¶ 16–

---

[2] Defendants' response states in relevant part "OAG has no role in receiving, processing, or ruling upon certifications submitted under GA-15 and cannot confirm...whether any specific facility complies with GA-15's certification requirement." *See* Ex. 22, attached hereto. This response provides no information on the position of Defendant Wilson, Acting Executive Commissioner of the Texas Health and Human Services Commission, to which the required submissions must be submitted, or of the other Defendants charged with enforcement of the Executive Orders.

Providers respectfully request the opportunity to supplement these filings with additional argument and evidence if Defendants take the position that GA-15's exception does not apply to Provider Plaintiffs' facilities, as this would implicate additional issues not addressed herein.

[3] A complete list of all testimony and briefing that Providers are designating is set forth in Appendix A, attached hereto.

17. In the most recent year for which data are available, only two-tenths of a percent (0.2%) of Texas abortions were performed in hospitals. *See* Ex. 40, attached hereto.

After ten weeks of pregnancy as measured from the first day of their last menstrual period ("LMP"), patients are not eligible for medication abortion in Texas; but must have procedural abortions. *See* Tex. Health & Safety Code § 171.063(a)(2). Early procedural abortions are performed using aspiration. Starting around twelve to thirteen weeks LMP, abortion requires same-day cervical preparation, which requires several hours in the health center. Schutt-Aine 2d Decl. ¶ 30. Beginning at fourteen to sixteen weeks LMP, procedural abortion is provided by D&E rather than aspiration. *Id.* ¶¶ 16, 39. Between approximately fifteen and eighteen weeks LMP, patients must have two-day rather than single-day D&E procedures. Braid Decl. ¶ 9; Schutt-Aine 2d Decl. ¶ 34. At eighteen weeks LMP, patients must seek abortion care at ambulatory surgical centers ("ASCs") or hospitals. *See* Tex. Health & Safety Code § 171.004. Texas prohibits abortion, absent exceptional circumstances, beginning at twenty-two weeks LMP. *See* Tex. Health & Safety Code § 171.044.

**B. Burdens on Abortion Access Imposed by the Executive Orders.**

As interpreted by Defendants, the Executive Orders function as a six-week long abortion ban. As a result, Texas residents with means to travel are leaving the State in droves to obtain abortion care. *See* Boyd Decl. ¶¶ 6, 8–9; Doe Decl. ¶¶ 15–22; Ferrigno 2d Decl. ¶¶ 5–6; Hagstrom Miller 2d Decl. ¶ 6; Johnson Decl. ¶¶ 8–10; Jones Decl. ¶ 15; Lamunyon Sanford Decl. ¶¶ 16–18; Moe Decl. ¶ 18; Nguyen Decl. ¶ 17; Schalit Decl. ¶¶ 15–16; Ward Decl. ¶¶ 12–14. Those unable to travel out of state are forced to wait as their pregnancies progress.

Texas abortion providers expect to have substantial backlogs when the Executive Orders expire. *See, e.g.*, Dewitt-Dick 2d Decl. ¶ 9 (one-month cessation will result in a backlog of approximately 800 patients); *id.* ¶ 11 (it will take two months to resolve backlog, pushing

additional patients past the legal limit in Texas); *see also* Ferrigno Decl. ¶ 29; Hagstrom Miller Decl. ¶ 29; Johnson Decl. ¶ 12; Nguyen Decl. ¶ 23; White Decl. ¶¶ 21, 27. Combined with social-distancing policies that reduce patient volume, *see* Ferrigno 2d Decl. ¶ 4; Hagstrom Miller 2d Decl. ¶ 4; Schutt-Aine Decl. ¶ 30, and Texas laws that delay abortion access during normal times,[4] those backlogs will inevitably prevent some people from obtaining an abortion in Texas for at least another one to two weeks. Clinics in neighboring states are experiencing long wait-times for appointments due to the influx of Texas patients. Boyd Decl. ¶ 9.

The Executive Orders impose heavy burdens both on those who are able to travel out of state to access abortion and those who must wait in Texas until the ban is lifted. These burdens generally fall into the following categories: (1) increased health risks; (2) physical discomfort, emotional distress and loss of privacy; (3) travel-related burdens; (4) economic costs; (5) increased safety risks; and (6) forced childbirth. Many of these burdens compound one another.

### 1. *Increased health risks.*

Those who must wait weeks to access abortion care face increased health risks, whether they remain pregnant or are able to have a later abortion. The risks of pregnancy and abortion increase with gestational age. Macones Decl. ¶ 8; Schutt-Aine Decl. ¶ 22. Similarly, while very low, risk of major complications—those requiring hospital admission, surgery, or blood transfusion—from abortion is approximately 2.5 times greater in the second trimester than in the first. Schutt-Aine 2d Decl. ¶¶ 26–27. Some people unable to access abortion in a healthcare setting will turn to unsafe methods to end their pregnancies. Levison Decl. ¶ 11; Roe ¶ 15.

---

[4] Texas' mandatory waiting period law, Tex. Health & Safety Code § 171.012(a)(4), (b), for example, delays abortion access for many Texans. Jones Decl. ¶ 12.

4

Those who must travel long distances to obtain abortion care also face increased health risks—they are at higher risk of contracting and spreading COVID-19. Bassett Decl. ¶¶ 7–8; Schutt-Aine ¶ 37; Sharfstein 2d. Decl. ¶ 10. One woman approaching the gestational limit for medication abortion described making a hazardous twelve-hour drive from Arlington, Texas, to Denver, Colorado, to access that care. Doe Decl. ¶¶ 12, 15–16; *see also id.* at ¶ 25.

###### 2. *Physical discomfort, emotional distress, and loss of privacy.*

Individuals denied access to abortion must continue to cope with pregnancy-related physical symptoms, such as severe nausea and vomiting, shortness of breath, frequent urination and dizziness, and conditions exacerbated by pregnancy, such as hypertension, diabetes, kidney disease, autoimmune disorders, and asthma. Schutt-Aine 2d Decl. ¶¶ 6, 8; Bennett Decl. ¶ 25; Hagstrom Miller Decl. ¶ 33. They must also endure not knowing when—or if—they will be able to obtain an abortion, which is "devastat[ing]," Hagstrom Miller 2d Decl. ¶ 6. *See also* Bennett Decl. ¶ 22; Nguyen Decl. ¶ 13. Those who want to keep their pregnancy private must struggle to conceal their pregnancies for a longer period of time. Doe Decl. ¶ 6 (individual did not want prospective employers to know she was pregnant); Ferrigno 2d. Decl. ¶ 6. Revealing a pregnancy may also put individuals with abusive partners or family at risk of harm. *See infra* at 8–9.

###### 3. *Travel-related burdens.*

The need to travel to access abortion is itself a burden, Lamunyon Sanford Decl. ¶ 10, and Texas residents with means are currently traveling long distances to reach out-of-state abortion providers. *See* Ward Decl. ¶ 12 ("average distance traveled . . . jumped from 158 miles in 2019 to 734 miles" since the Executive Orders); Gomez Decl. ¶ 14 (Texans traveling to Arizona, Kentucky, Louisiana, Mississippi, New Mexico, Oklahoma, and Virginia); Schalit Decl. ¶¶ 15–16 (Texans traveling to New Mexico, Kansas, and Illinois). Some have taken lengthy road trips and others have had to fly. Lamunyon Decl. ¶ 11 (describing travel of up to 860 miles, one way); Ward

Decl. ¶ 14 (most clients are flying "because the health risks involved in air travel have made it much more affordable").

Long-distance travel is expensive, prohibitively so for some. *See* Ward Decl. ¶¶ 6, 8; Moe Decl. ¶¶ 14, 19; Bennett ¶¶ 9, 11. It is also fraught with logistical challenges, including the need to secure lodging and childcare, take time off from work, and explain one's whereabouts to family members or others. *See* Bennett Decl. ¶¶ 2, 8–9; Gomez Decl. ¶¶ 1, 9; Jones Decl. ¶¶ 8, 12; Lamunyon Sanford Decl. ¶¶ 8, 10, 12; Moe Decl. ¶¶ 14, 18; Schalit Decl. ¶¶ 1, 4; Ward Decl. ¶ 10. Organizations that assist people with abortion access can mitigate some of these burdens but cannot alleviate them completely. *See* Bennett Decl. ¶ 16; Conner Decl. ¶ 7; Gomez Decl. ¶ 16; Moe Decl. ¶ 8, 12; Ward Decl. ¶¶ 1, 4, 8. In addition, the need to travel often delays access to abortion because, for many, it takes time to make arrangements and raise the necessary money. Bennett Decl. ¶ 11; Heflin Decl. ¶¶ 51–61; Jones Decl. ¶ 12; Lamunyon Sanford Decl. ¶¶ 10, 12–13; Moe Decl. ¶ 14; Ward Decl. ¶ 7; *see also* Schalit Decl. ¶¶ 1, 4–5.

The COVID-19 pandemic makes travel "increasingly fraught, and even dangerous." Lamunyon Sanford Decl. ¶¶ 11–13; *see also* Moe Decl. ¶ 21 (reductions in flights; common delays and cancellations); Gomez Decl. ¶¶ 9-13 (difficulty finding local transportation and hotels; confusion due to state rules for out-of-state travelers during pandemic); Conner Decl. ¶ 11 (increased difficulty securing childcare); Ward Decl. ¶ 10 (delays caused by greater logistical barriers during pandemic); *infra* pp. 11–12 (travel increases risk of contagion).

4. *Economic costs*.

Delays can drive up the cost of an abortion, which increases with gestational age together with the duration and complexity of the procedure. Jones Decl. ¶ 15 (cost of a client's abortion increased about $1,500 due to two-week delay); Dewitt-Dick Decl. ¶ 22; Ferrigno Decl. ¶ 36; Hagstrom Miller 2d Decl. ¶¶ 7–10; Moe Decl. ¶ 8; Ward Decl. ¶ 6; White Decl. ¶ 25. For example,

a medication abortion at one Texas clinic costs $725. Hagstrom Miller 2d Decl. ¶ 8. A procedural abortion at that clinic costs $750 before twelve weeks LMP, and increases by $100 every week thereafter, reaching $1,350 by eighteen weeks LMP. *Id*. An abortion at a Texas ASC at 21–22 weeks LMP costs at least $3,000. *Id*. ¶ 10. Most patients will need to pay these costs out-of-pocket because Texas generally bars coverage of abortion in public *and* private insurance plans.[5] And as discussed above, the need to travel also adds to the cost of an abortion. *Supra* p. 6–7.

Even in normal times, roughly 75% of people seeking abortion are poor or low-income. Heflin Decl. ¶ 37. The pandemic has profoundly impacted people's financial resources. Between March 15th and April 4th, 2020, 760,000 Texans filed for unemployment, exceeding the roughly 700,000 claims filed in all of 2019. Heflin Decl. ¶ 10; *see also, e.g.*, *id.* ¶¶ 13–14 (record number of Texans applying for SNAP benefits and relying on food pantries); Moe Decl. ¶ 15 (callers "struggling with loss of work, income, employer-sponsored health insurance, and childcare" and "finding it difficult to pay their rents, mortgages, and bills"); Ward Decl. ¶ 10 ("One client recently worked to raise money for her abortion care for weeks only to have to use it for rent."); Doe Decl. ¶¶ 5–6 (patient lost job at restaurant right as she discovered she was pregnant).

5.  ***Forced childbirth.***

Those who are delayed past twenty-two weeks LMP and who cannot travel out of state for an abortion will be forced to give birth. *See* Gomez Decl. ¶ 18. Even before their duration was extended by the GA-15, the record demonstrated that the Orders would push many individuals past Texas's gestational age limit. Hagstrom Miller ¶ 27; Ward ¶ 12; Conner Decl. ¶ 10; Johnson ¶ 10; Moe Decl. ¶ 19. Further, obtaining abortion care in other states is becoming increasingly difficult because abortion clinics do not have capacity to see the large volume of Texas patients now seeking

---

[5] Guttmacher Inst., *Regulating Insurance Coverage of Abortion* (Apr. 1, 2020), https://www. guttmacher.org/state-policy/explore/regulating-insurance-coverage-abortion.

their services. Boyd Decl. ¶ 13 (New Mexico clinic is "simply overwhelmed with requests from Texas women and often unable to meet the sudden increase in need for timely care"); Moe Decl. ¶ 18 (by April 1, New Mexico clinic was scheduling appointments for Texas patients between April 8–24 though that clinic is "generally able to see our callers within a week of being contacted"); Conner Decl. ¶ 11; Johnson Decl. ¶ 9.

**6.   *Increased risks of abuse.***

Patients who have been victims of intimate partner violence ("IPV") and minors with abusive parents are at particular risk of harm from forced delays in access to abortion, and of being unable to access abortion altogether after the Executive Orders end. Stay-at-home guidelines have heightened the frequency and severity of IPV.[6] Even before the pandemic, pregnancy was associated with increased and more severe violence in abusive relationships.[7] To avoid further harm, including being denied abortion, a pregnant person may need to keep their pregnancy and abortion decision confidential, *see* Moe Decl. ¶ 19; Gomez Decl. ¶ 13, which is more difficult as access is delayed, Bennett Decl. ¶ 10; Moe Decl. ¶ 19.

For minors who have obtained a judicial bypass due to abuse or other hardships, *see* Northcutt Decl. ¶¶ 3–6, delay likewise threatens their health and safety and may prevent their access to abortion entirely. A judge has already determined that these minors should obtain an abortion promptly because, for example, any delay "increases the risk to the applicant's health." Nguyen Decl. ¶ 18 & Ex. A. And abortion access may be necessary to prevent further hardship imposed by a minor's parents. Northcutt Decl. ¶ 5 (describing potential homelessness if parent

---

[6] *See* Amanda Taub, *A New Covid-19 Crisis: Domestic Abuse Worldwide*, N.Y. Times (Apr. 14, 2020), https://www.nytimes.com/2020/04/06/world/coronavirus-domestic-violence.html; Am. Psychological Ass'n, *How COVID-19 May Increase Domestic Violence and Child Abuse* (Apr. 8, 2020), https://www.apa.org/topics/covid-19/domestic-violence-child-abuse.

[7] Julie A. Gazmararian et al., *Prevalence of Violence Against Pregnant Women*, 275 JAMA 1915, 1918 (1996).

discovered pregnancy). Minors in these circumstances are having appointments cancelled because of the Executive Orders, further increasing the risks and other burdens. Northcutt Decl. ¶¶ 5–6; Nguyen Decl. ¶¶ 18–19. Most lack the financial, social, and familial resources to travel out of state to obtain abortion care. Northcutt Decl. ¶¶ 4, 7; Nguyen Decl. ¶¶ 18–19.

### C. Asserted State Interests.

Defendants assert three interests supporting the Executive Orders: (1) conserving PPE; (2) conserving hospital capacity; and (3) preventing COVID-19's spread. None is advanced by banning and forcibly delaying abortion.

#### 1. *Conserving PPE during the pandemic.*

The State's asserted interest in conserving PPE is not served by banning or forcibly delaying abortion for at least three reasons. **<u>First</u>**, individuals with ongoing pregnancies require more interactions with the healthcare system, involving more PPE, than individuals who obtain abortions. Levison Decl. ¶¶ 12–14; Macones Decl. ¶ 20; Schutt-Aine Decl. ¶ 26; Rosenfeld Decl. ¶ 15. Pregnant people must have regular, in-person medical visits to safeguard their own health, even if they intend to have an abortion. Chang Decl. ¶ 8; *see also* Levison Decl. ¶¶ 18–19. Pregnancy poses significant health risks, which are heightened for people with underlying conditions such as diabetes, high-blood pressure, and obesity. Schutt-Aine 2d Decl. ¶¶ 6–8. The Executive Orders impose no limits on routine pregnancy-related care, including physical examinations, ultrasounds, and laboratory tests. Macones Decl. ¶ 12; Levison Decl. ¶ 19; Chang Decl. ¶¶ 8–9. Doctors are continuing to provide such care during the pandemic, even while reducing other in-person visits. Levison Decl. ¶ 18; Macones Decl. ¶¶ 10–12. High-risk patients and patients in their second and third trimesters have more frequent in-person visits. Macones Decl. ¶¶ 10, 12. PPE used for prenatal care varies by provider, but at minimum, providers use gloves for physical examinations, vaginal ultrasounds, and laboratory testing, and wear masks and

other PPE whenever a patient has symptoms of COVID-19 or is at high risk of contracting the virus. Levison ¶¶ 13, 17; Chang ¶ 15, 25; Macones Decl. ¶ 17. Some OB/GYNs wear masks for all patient interactions and give patients the option of wearing masks. Wood Decl. ¶ 16.

In contrast, providing abortion care requires little or no PPE. Medication abortion requires a single, in-person visit without physical contact between doctor and patient, and no PPE is needed. *See* Schutt-Aine 2d Decl. ¶ 38. Aspiration abortion likewise requires a single, in-person visit during which minimal PPE is used. *See, e.g.*, Barraza Decl. ¶ 7; Ferrigno Decl. ¶¶ 10, 12; Klier Decl. ¶ 11; Schutt-Aine Decl. ¶¶ 25; Wallace Decl. ¶ 12. D&E abortion requires one or two in-person visits, depending on gestational age, during which minimal PPE is used. Abortion providers generally do not use N95 masks. Only one physician associated with Plaintiffs has used an N95 mask since the pandemic began, and that physician has been reusing the same mask. *See, e.g.*, Barraza Decl. ¶ 8; Hagstrom Miller Decl. ¶ 16; Schutt-Aine Decl. ¶ 27. Plaintiffs are not treating patients with COVID-19 symptoms. *See, e.g.*, Ferrigno Decl. ¶ 17; Lambrecht Decl. ¶ 16; Schutt-Aine Decl. ¶ 31. They screen those patients in advance and refer them for treatment. *Id.*

Texas law requires an ultrasound and in-person consultation before every abortion. Tex. Health & Safety Code §171.012(a)(4), (b). For patients living within 100 miles of the facility, the consultation must occur at least twenty-four hours before the abortion. *Id.* A pre-abortion ultrasound requires no more PPE than an ultrasound performed for prenatal care. *Compare* Ferrigno Decl. ¶ 11, *and* Hagstrom Miller Decl. ¶ 14, *with* Macones Decl. ¶ 14. When laboratory testing is required along with an abortion, technicians use only non-sterile gloves, just as with laboratory tests for prenatal care. *Compare* Hagstrom Miller Decl. ¶ 14 *with* Macones Decl. ¶ 14.

Notably, in addition to routine prenatal care, doctors continue to offer other obstetrical and gynecological care comparable to abortion in PPE use and time-sensitivity. *See* Chang Decl. ¶ 24;

Levison Decl. ¶ 18; Macones Decl. ¶ 19. Doctors also continue to prescribe or recommend oral medications comparable to the medications used to induce an abortion. Schutt-Aine 2d Decl. ¶ 47.

**Second**, abortion becomes more complex as pregnancy progresses, in turn requiring more PPE. Medication abortion, available in Texas to ten weeks LMP, requires no PPE. *See* Tex. Health & Safety Code § 171.063(a)(2); Barraza Decl. ¶ 7; Dewitt-Dick Decl. ¶ 19; Schutt-Aine Decl. ¶ 25. After ten weeks LMP abortion involves an aspiration procedure and limited PPE, such as gloves, a surgical mask, and a disposable or washable gown. Barraza Decl. ¶ 7; Dewitt-Dick Decl. ¶ 19; Ferrigno Decl. ¶¶ 10, 12; Hagstrom Miller Decl. ¶¶ 13, 15; Klier Decl. ¶ 11; Lambrecht Decl. ¶ 12; Rosenfeld Decl. ¶ 11; Schutt-Aine Decl. ¶ 25; Wallace Decl. ¶ 12. Around fourteen to sixteen weeks LMP the provider generally must use instruments to complete the procedure, usually requiring additional dilation and possibly additional staff and PPE. Ferrigno Decl. ¶ 35; Hagstrom Miller Decl. ¶ 34; Lambrecht Decl. ¶ 18; Schutt-Aine Decl. ¶¶ 16, 35; Schutt-Aine 2d Decl. ¶ 31. Beginning approximately fifteen to eighteen weeks LMP the dilation process must begin the day before the procedure, requiring two separate trips to the health center and an additional visit's worth of PPE. Schutt-Aine Decl. ¶¶ 16, 39; Schutt-Aine 2d Decl. ¶¶ 32, 34. Moreover, as detailed below, while abortion remains safe throughout pregnancy (and safer than childbirth), risks increase with gestational age, Schutt-Aine Decl. ¶ 22, and accordingly so does the risk that PPE may be needed to treat any complications that do arise (such treatment generally occurs at the health center where the abortion was provided).

**Finally**, forcing patients to attempt travel for care they could otherwise obtain locally results in no net savings of PPE, but rather increases contagion risks for both the patient and others. Bassett Decl. ¶¶ 6–8; Sharfstein 2d Decl. ¶¶ 9–11. If anything, such travel may increase the amount of PPE used because a patient forced to travel out-of-state will likely be delayed in doing so, and

may therefore require a more complex procedure involving more PPE. Schutt-Aine Decl. ¶¶ 16, 35, 39; Sharfstein 2d Decl. ¶ 11.

### 2. *Conserving hospital capacity during the pandemic.*

Likewise, preventing people from accessing abortion care during the pandemic will not conserve hospital capacity. As discussed above, nearly all abortions are provided in outpatient facilities rather than hospitals. *See supra* p. 2. Major complications occur in less than one-quarter of one percent (0.23%) of all abortion cases: in 0.31% of medication abortion cases, in 0.16% of first-trimester procedural abortion cases, and in 0.41% of procedural cases in the second trimester or later. Schutt-Aine Decl. ¶ 12. Abortion-related emergency room visits constitute just 0.01% of all emergency room visits in the United States. *Id.* Individuals with ongoing pregnancies are far more likely to seek treatment in a hospital (including in an emergency department) than individuals who have pre-viability abortions. Levison Decl. ¶¶ 8–11; Loe Decl. ¶¶ 14, 16; Macones Decl. ¶ 19; Roe Decl. ¶¶ 10–13; Schutt-Aine Decl. ¶ 26; Schutt-Aine 2d Decl. ¶¶ 9, 11, 13, 19. And as discussed below, forcing patients with the means to do so to travel long distances to attempt to obtain care increases contagion risks, including the risk that those patients or their close contacts will develop symptoms of COVID-19 requiring hospital care.

### 3. *Reducing the spread of COVID-19.*

As explained above, people denied access to abortion will still require regular, in-person visits with medical practitioners. *Supra* pp. 9–11. Accordingly, banning abortion will not reduce the risk of COVID-19 transmission in healthcare settings. In fact, because the Executive Orders are causing many Texas residents to travel out of state for abortion care, they are actually *increasing* the risk of COVID-19 transmission. *Supra* pp. 11–12.

**D.  Procedural History.**

On March 25, 2020, Providers moved for a temporary restraining order ("TRO"), ECF No. 7, which this Court granted "as applied to medication abortions and procedural abortions." Order Granting Pls.' Req. for TRO at 8, ECF No. 40. Defendants petitioned the Fifth Circuit for a writ of mandamus to vacate the TRO. A divided panel of the Fifth Circuit administratively stayed the TRO, *In re Abbott*, No. 20-50264 (5th Cir. Mar. 31, 2020) (per curiam), and then granted the mandamus petition, *In re Abbott*, No. 20-50264, 2020 WL 1685929, at *1 (5th Cir. Apr. 7, 2020).

The panel majority concluded that mandamus was appropriate for three reasons. First, it held that this Court erred by not applying *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905), under which this Court "was empowered to decide only whether GA-09 lacks a 'real or substantial relation' to the public health crisis or whether it is 'beyond all question, a plain, palpable invasion' of the right to abortion." *In re Abbott*, 2020 WL 1685929, at *8 (citing *Jacobson*, 197 U.S. at 31). Second, the panel rejected Providers' argument that the Executive Orders operate as an "outright [abortion] ban." *Id.* at *10. Because it concluded the first Order did not impose a ban, the panel held that the undue-burden balancing test in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992), applies. *Id.* at *10–12. Given the overlay of *Jacobson*, the panel held that "*certain applications* of GA-09 may constitute an undue burden under *Casey*," where Providers can show, "'beyond question,' GA-09's burdens outweigh its benefits in those situations." *Id.* at *9 (quoting *Jacobson*, 197 U.S. at 31) (emphasis added). Third, the majority held that any determination whether the TRO served the public interest should "weigh the potential injury to the public health" from enjoining enforcement of the first Order. *Id.* at *12. Critically, the panel emphasized that it was not expressing an opinion as to "whether an injunction narrowly tailored to particular circumstances would pass muster under the *Jacobson* framework." *Id.* It explained that "[t]hese are issues that the parties may pursue at the preliminary injunction stage,

13

where [Providers] will bear the burden to prove, 'by a clear showing,' that they are entitled to relief." *Id.*

On remand, Providers filed a second TRO motion, seeking more limited relief. ECF No. 56. The Court granted the motion on April 9, 2020, temporarily restraining Defendants from enforcing the first Order as a categorical ban on all abortions; against medication abortions; against procedural abortion for any patient who, based on the treating physician's medical judgment, would be more than eighteen weeks LMP on April 22, 2020, and likely unable to reach an ASC in Texas or to obtain abortion care; and against procedural abortion for any patient who, based on the treating physician's medical judgment, would be past the legal limit for an abortion in Texas—22 weeks LMP—on April 22, 2020. Order Granting Pls.' Second Mot. for TRO at 15, ECF No. 63. The TRO was set to expire on April 19, 2020, at 4:25 p.m., unless "extended for good cause, pursuant to Federal Rule of Civil Procedure 65." *Id.*

Defendants filed another mandamus petition and motion to stay the TRO. On April 10, 2020, the Fifth Circuit administratively stayed the second TRO "EXCEPT that part of the TRO applying to 'any patient who, based on the treating physician's medical judgment, would be past the legal limit for an abortion in Texas" by the Order's expiration. *In re Abbott*, No. 20-50296, slip op. at 4 (5th Cir. Apr. 10, 2020) (per curiam). Following additional briefing by the parties and Plaintiffs' application to the U.S. Supreme Court to vacate a portion of the Fifth Circuit's stay, the Fifth Circuit dissolved the administrative stay and denied Defendants' motion to stay the TRO as to medication abortion. *In re Abbott*, No. 20-50296, 2020 WL 1866010 (5th Cir. Apr. 13, 2020).

On April 14, 2020, this Court set a preliminary injunction hearing for April 29, 2020; entered a briefing schedule; and extended the TRO, as modified by the Court of Appeals, until May 1, 2020, at 5 p.m. Order Extending Order Granting Pls.' Second Mot. for TRO & Scheduling

Order for Pls.' Mot. for Prelim. Inj. at 2–4, ECF No. 82. The next day, despite their pending

mandamus petition, Defendants filed an interlocutory appeal from the TRO as well as a motion for

stay pending appeal. Appellants' Opposed Emergency Mot. to Stay Pending Appeal and,

Alternatively, for a Temp. Administrative Stay, *Planned Parenthood Ctr. for Choice v. Abbott*,

No. 20-50314 (5th Cir. Apr. 15, 2020). All remain pending.

**ARGUMENT**

Providers are entitled to a preliminary injunction because the record demonstrates that (1)

they have a substantial likelihood of success on the merits; (2) their patients are experiencing

irreparable injury; (3) that injury outweighs any harm to Defendants; and (4) granting the

injunction will not disserve the public interest. *Jackson Women's Health Org. v. Currier*, 760 F.3d

448, 452 (5th Cir. 2014); *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011).[8]

## I.  PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

The right to end a pregnancy is a fundamental component of the liberty protected by the

Due Process Clause. *See, e.g.*, *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2309–10

(2016); *Casey*, 505 U.S. at 851–53 (1992); *Roe v. Wade*, 410 U.S. 113, 152–54 (1973). Laws that

infringe on this right are subject to the undue-burden standard set forth in *Casey*, which "requires

that courts consider the burdens a law imposes on abortion access together with the benefits those

laws confer." *Whole Woman's Health*, 136 S. Ct. at 2309. Where the burdens are disproportionate

to the benefits, the law is unconstitutional. *See id.* at 2300, 2309–10.

The undue burden standard is a form of heightened scrutiny. *Id.* at 2309–10. To satisfy it,

the State cannot merely assert that a challenged law is rationally related to a valid state interest. *Id.*

---

[8] For the reasons set forth in Plaintiffs' Mot. for TRO and/or Prelim. Inj. at 27–28, ECF No. 7, which is hereby designated by Providers, the Court should waive the bond requirement in Federal Rule of Civil Procedure 65(c).

at 2309. Instead, the State must demonstrate that the law actually advances the asserted interest—and that it does so to an extent sufficient to justify the burdens that it imposes on abortion access. *Id.* at 2300, 2309–10 ("[T]he 'Court retains an independent constitutional duty to review factual findings where constitutional rights are at stake.'" (quoting *Gonzales v. Carhart*, 550 U.S. 124, 165 (2007))).

The Fifth Circuit directed this Court to apply the undue-burden standard in tandem with the principles set forth in *Jacobson*, which it views as providing "the framework governing emergency public health measures like [the Executive Orders]." *In re Abbott*, 2020 WL 1685929, at *1. This Court must ask "whether [the Executive Orders] impose burdens on abortion that 'beyond question' exceed its benefits in combating the epidemic Texas now faces." *Id.* at *11 (quoting *Jacobson*, 197 U.S. at 31). This inquiry is fact-specific, "requiring careful parsing of the evidence." *Id.*[9]

The Executive Orders fail to satisfy the constitutional standard set forth by the Fifth Circuit. The burdens imposed by these laws are unwarranted as to all people seeking abortions, and especially as to (1) patients seeking medication abortions; (2) patients seeking procedural abortions after ten weeks LMP, including patients who, by the Executive Orders' expiration, (a) will likely be ineligible for aspiration abortion; (b) will likely be ineligible for a single-day D&E abortion; (c) will likely be ineligible for abortion in a clinic setting; or (d) will likely be past the gestational age limit for abortion in Texas; and (3) patients experiencing IPV and minors who have obtained judicial bypasses.

---

[9] Plaintiffs reassert and preserve for appeal their arguments that the Executive Orders as applied to provision of abortion care are unconstitutional because (1) they impose an outright ban on previability abortion, *see Roe* and *Casey*, and (2) they impose an undue burden under the test described in *Casey*, which is not modified during a public health emergency, by *Jacobson* or otherwise.

**A.  The Executive Orders Impose Unconstitutional Burdens on Texas Residents Seeking Medication Abortions.**

Applying the Executive Orders to medication abortion beyond question fails to serve Defendants' asserted interests in conserving PPE and hospital capacity or limiting the spread of COVID-19. The record shows that medication abortion requires *no PPE*. *Supra* p. 10. Although Texas requires an in-person consultation and ultrasound examination before a medication abortion, *see* Tex. Health & Safety Code § 171.012(a)(4), (b), the Texas Medical Board has issued guidance indicating that those services—whether provided in the context of abortion care or prenatal care— do not fall within the scope of the Executive Orders' prohibitions.[10] In any event, these pre-abortion visits require little or no PPE. *Supra* p. 10. Moreover, banning medication abortion fails to serve Defendants' interest in conserving PPE because individuals with ongoing pregnancies will require more in-person healthcare, including ultrasounds, physical examinations, and lab tests, during the pandemic than individuals who have medication abortions. *Supra* pp. 9–11.

Further, virtually all medication abortions are provided in outpatient facilities rather than hospitals, and complications associated with medication abortion, including any requiring hospital care, are exceedingly rare. *Supra* pp. 11–12. Delaying or denying abortion access does not conserve hospital capacity because patients with continuing pregnancies are far more likely to seek hospital care than patients who terminate a pregnancy before viability. *Supra* p. 12; Levison Decl. ¶ 10 (testifying that at least twenty percent of pregnant patients will visit a hospital at some point prior to delivery, some on multiple occasions).

---

[10] Tex. Med. Bd., Texas Medical Board (TMB) Frequently Asked Questions (FAQs) Regarding Non-Urgent Elective Surgeries and Procedures During Texas Disaster Declaration for COVID-19 Pandemic (Mar. 29, 2020), Ex. A to Schutt-Aine 2d Decl. While Defendants characterize these services as part of a single, multi-step medication abortion "procedure," if this were so, it would be impossible to comply with Texas's law requiring the ultrasound to occur "at least 24 hours *before* the abortion." Tex. Health & Safety Code §171.012(a)(4) (emphasis added).

The Executive Orders' application to medication abortion also undermines Defendants' asserted interest in thwarting the spread of COVID-19. As discussed above, it has increased the risk that patients will contract and transmit the virus by forcing them to travel extensive distances to obtain a medication abortion. *See* Bassett Decl. ¶ 7; Doe Decl. ¶ 18.

In these ways, Defendants' threats to enforce the Executive Orders against those who provide medication abortions lack any "real or substantial relation" to the public health objectives offered to justify them, contravening *Jacobson*, 197 U.S. at 31.

The Executive Orders' failure to further Defendants' interests is plainly outweighed by their profound burdens on medication abortion patients—which will continue without injunctive relief. They have already forced Providers to cancel hundreds of appointments, including for medication abortion, thus delaying patient care. *See, e.g.*, Dewitt-Dick Decl. ¶ 8; Johnson Decl. ¶ 4; Klier Decl. ¶ 17; Nguyen Decl. ¶ 8; Wallace Decl. ¶ 9; Rosenfeld Decl. ¶ 9. Delayed abortion access subjects patients to increased health risks, *supra* pp. 4–5, greater financial burdens, *supra* pp. 6–7, and other harms, ranging from the physical and psychological impact of unwanted pregnancy to fear that an abusive partner or family member will learn of the pregnancy or intended abortion, *supra* pp. 5, 8–9. Moreover, the Executive Orders have compelled patients to travel long distances out of state during a pandemic to obtain pills that they could take at home. *See, e.g.*, Doe Decl. ¶¶ 9, 19–22. These burdens are "beyond question" undue in relation to the illusory benefits of applying the Executive Orders to medication abortion. *In re Abbott*, 2020 WL 1685929, at *9 (citing *Jacobson*, 197 U.S. at 31); *see also Whole Woman's Health*, 136 S. Ct. at 2300, 2309–10.

Enforcing the Executive Orders as to medication abortion is also at odds with the Fifth Circuit's standard because it singles out medication abortion for disfavored treatment without justification. *In re Abbott*, 2020 WL 1685929, at *19 (citing *Jacobson*'s prohibition on states

18

exercising their authority to "safeguard the public health" in an "arbitrary, unreasonable manner"). Defendants have yet to identify another oral medication they consider banned by the Executive Orders, which on their face apply only to "surgeries and procedures." *Supra* p. 11. Indeed, the record shows that the Executive Orders exempt treatments comparable to medication abortion and the care accompanying it. *See, e.g.*, Levison Decl. ¶¶ 13, 18–19 (noting that most prenatal care, which includes ultrasounds, physical exams, and blood tests, is continuing during the pandemic).

**B. The Executive Orders Impose Unconstitutional Burdens on Texas Residents Seeking Procedural Abortions.**

The Executive Orders also impose unwarranted burdens on people seeking procedural abortions. For the reasons explained above, the Executive Orders fail to advance Defendants' asserted public health interests in any material way. *See supra* pp. 9–12 (continuing a pregnancy conserves no PPE because it requires more in-person healthcare at each stage of pregnancy than obtaining a previability abortion; abortions later in pregnancy use more PPE; and forcing patients to travel results in contagion risks that deplete rather than conserve PPE); *supra* p. 12 (patients with continuing pregnancies are far more likely to seek hospital care than patients who terminate a pregnancy before viability; abortion later in pregnancy, while safe, carries more risk of complications than earlier abortions; and forced travel results in contagion risks that increase the chances of hospital-based care); *supra* pp. 11–12 (out-of-state travel heightens the risk that abortion patients will contract and transmit the COVID-19 virus to others).

On the other hand, the Executive Orders impose heavy burdens on people seeking procedural abortions. These burdens, detailed above, include increased health risks, *supra* pp. 4–5; physical discomfort, emotional distress and loss of privacy, *supra* p. 5; travel-related burdens, *supra* pp. 5–6; economic costs, *supra* pp. 6–7; forced childbirth, *supra* pp. 7–8; and increased risk of abuse by a partner or family member, *supra* pp. 8–9.

Because these burdens are outweighed by any possible benefit and lack any "real or substantial relation" to the state's interest, they cannot be applied abortion procedures, but these burdens are most severe and unjustified in the following categories:

### 1.   *Individuals seeking procedural abortions after ten weeks LMP.*

Texas law prohibits medication abortion after ten weeks LMP, so individuals turned away from procedural abortion will either lose all access in Texas or be forced to wait until they are at a later stage of pregnancy when their procedure will involve more PPE. Further, the risks of pregnancy, Macones Decl. ¶ 8, and abortion, Schutt-Aine Decl. ¶ 22, increase with gestational age. Also, after twelve weeks LMP, the abortion costs increases significantly each week as the length and complexity of the procedure increases. Hagstrom Miller 2d Decl. ¶ 8. This increased cost leads to further delay. Heflin Decl. ¶¶ 41–43, 48, 50–52. For these reasons, being delayed past ten weeks LMP, or forced to seek care elsewhere, imposes substantial burdens on Texas residents. And such delays or forced travel *increase* use of PPE, hospital resources, and contagion risks, and thus lack any "real or substantial relation" to the state's interests. *Jacobson*, 197 U.S. at 31.

### 2.   *Individuals who will likely be ineligible for aspiration abortion by the time the Executive Orders expire.*

Beginning around fourteen to sixteen weeks LMP, abortion patients must have a D&E abortion, which is a lengthier, more complex, and more expensive procedure than aspiration; it also uses more PPE and requires more time at the health center, and (while very safe) carries higher risks of complications. Ferrigno Decl. ¶¶ 35–36; Hagstrom Miller Decl. ¶¶ 34–35; Schutt-Aine Decl. ¶¶ 16, 39; Schutt-Aine 2d Decl. ¶¶ 32–34. Thus, being delayed past fourteen weeks LMP can impose significant burdens on abortion patients, and further undermine any "real or substantial relation" to the state's interests.

**3.   *Individuals who will likely be ineligible for a single-day D&E abortion by the time the Executive Orders expire.***

D&E abortions are usually performed as two-day procedures beginning between fifteen to eighteen weeks LMP, depending on the individual patient and physician judgment. Schutt-Aine 2d Decl. ¶ 32. Thus, most abortion patients who require a two-day D&E procedure must make three rather than two trips to an abortion provider to terminate their pregnancy. *See* Tex. Health & Safety Code § 171.012(a)(4), (b). Multiple trips present many of the same logistical challenges as long-distance travel to obtain abortion care. Bennett Decl. ¶ 9; Jones Decl. ¶ 12; Moe Decl. ¶ 14. A two-day procedure involves more PPE and medical staff, as well as more time at the health center and trips back-and-forth, thus increasing risks of contagion and complication. Accordingly, the Executive Orders' application to this category of patients lacks any "real or substantial relation" to the State's interests.

**4.   *Individuals who will likely be ineligible to have an abortion in a clinic setting by the time the Executive Orders expire.***

Texas law requires abortion patients who exceed eighteen weeks LMP to obtain their care at an ASC rather than a licensed abortion facility. Tex. Health & Safety Code § 171.004. But just six of the ASCs in Texas (in only four cities) offer abortion care after eighteen weeks LMP. White Decl. ¶¶ 16–17. Long-distance travel is expensive, *supra* pp. 5–6, the cost of an abortion increases significantly with gestational age, *supra* at pp. 6–7, and about 75% of women seeking an abortion in the U.S. are poor or low-income. Heflin Decl. ¶ 37; *see* Ward Decl. ¶ 6. As a result, many Texas residents delayed past eighteen weeks LMP may be unable to access abortion and forced to carry to term. *See* Sanford Decl. ¶ 9. Patients delayed in or foreclosed from accessing abortion care will require more PPE and be exposed to higher health-related risks, again undermining any "real or substantial relation" to the state's interests.

**5. *Individuals who will likely be past the gestational age limit for abortion in Texas by the time the Executive Orders expire.***

Texas law prohibits abortion after twenty-two weeks LMP absent exceptional circumstances. Tex. Health & Safety Code § 171.044. Thus, delay past that gestational age forces Texans to carry their pregnancy to term or, for those with means, to leave the state to seek abortion care. *See, e.g.*, Ward Decl. ¶ 12; Moe Decl. ¶ 18; Bennett Decl. ¶ 24; Johnson Decl. ¶ 10. As this Court has held, application of the Executive Orders to procedural abortion patients in these circumstances at minimum unduly burdens their right to access a previability abortion. Order Granting Pls.' Second Mot. for TRO at 13, ECF No. 63; *see Casey*, 505 U.S. at 877. Those who manage to access care out of state obtain the care later in their pregnancies than they otherwise would—and suffer attendant health risks, financial burdens, and emotional costs. Thus, on this record, it is beyond question that the Executive Orders impose burdens that exceed any public health benefits. *See Jacobson*, 197 U.S. at 31; *Whole Woman's Health*, 136 S. Ct. at 2300, 2309–10.

**6. *Patients experiencing IPV and minors who have obtained judicial bypass.***

Patients experiencing IPV and minors who have obtained a judicial bypass are at particular risk of harm from forced delays in access to abortion, including of being unable to access an abortion altogether even after the Executive Orders' expiration. *Supra* at pp. 8–9. Because of these heightened harms, Defendants' interpretation of the Executive Orders to flatly bar abortions for this group again imposes burdens that exceed any public health benefit.

**C. Arbitrary and Unreasonable Treatment of Patients Seeking Procedural Abortion.**

As with medication abortion, applying the Executive Orders to procedural abortion is also unconstitutional because it singles out abortion care for disfavored treatment in an "arbitrary, unreasonable manner." *Jacobson*, 197 U.S. at 26. Texas physicians continue to provide obstetrical

and gynecological procedures comparable to procedural abortion in PPE use and time-sensitivity based on their professional medical judgment. Chang Decl. ¶ 22; Levison Decl. ¶ 18.[11] Indeed, all physicians other than abortion providers are permitted to exercise professional judgment as to whether a procedure can safely be postponed, and to rely on the guidance of leading professional organizations in so doing. Schutt-Aine 2d Decl. ¶¶ 48–50, 53–54. The Medical Board and Texas Medical Association agree that such judgment and reliance are appropriate. *Id.* Providers simply seek the same ability to care for their patients. *Cf. Robinson v. Marshall*, No. 2:19cv365-MHT, 2020 WL 1659700, at *3 (M.D. Ala. Apr. 3, 2020) (ordering that "[t]he reasonable medical judgment of abortion providers will be treated with the same respect and deference as the judgments of other medical providers" and that "decisions will not be singled out for adverse consequences because the services in question are abortions or abortion-related").

### D. Defendants' Arguments That This Court Lacks Authority to Enter an Injunction Are Meritless.

The Fifth Circuit has already held that "a justiciable controversy exists as to the [Defendant] health officials." *In re Abbott*, 2020 WL 1685929, at *5 n.17. It has further held that Providers "have standing to sue on their own behalf because the [Executive Orders] 'directly operates against them,'" *id.* (quoting *Planned Parenthood of Cen. Mo. v. Danforth*, 428 U.S. 52, 62 (1976), and that consideration of Providers' third-party standing may be deferred, *id.*

Defendants' remaining jurisdictional argument—that sovereign immunity bars Providers' claims against the Governor and Attorney General—is meritless. Providers' claims against the Governor are proper because he may modify, amend, rescind, or supersede the Executive Orders

---

[11] The singling out of abortion providers is further underscored by the fact that crisis pregnancy centers—which provide ultrasounds of no medical or diagnostic value—are advertising on their websites that they are providing ultrasounds during the COVID-19 pandemic. Nguyen 2d Decl. ¶¶ 16–17.

pursuant to their terms, Tex. Exec. Order No. GA-09 (Mar. 22, 2020) at 2, ECF No. 1-2; Tex. Exec. Order No. GA-15 (Apr. 17, 2020) at 2, Ex. 21, and his statutory authority, Tex. Gov't Code Ann. § 418.012. By exercising his authority to implement one Executive Order after another, the Governor has directly and continuously injured Providers and their patients. *See City of Austin v. Paxton*, 943 F.3d 993, 998, 1000, 1002 (5th Cir. 2019) (holding that the requirements of *Ex parte Young* are satisfied when a state official has the ability to "compel or constrain" plaintiffs' actions).

Similarly, the Attorney General has authority to prosecute Providers and their agents at the request of local prosecutors for alleged violations of the Executive Orders. Tex. Gov't Code Ann. § 402.028(a). His public threat to do so "with the full force of the law," ECF No. 1-1, directly caused Providers to cancel hundreds of abortion appointments and cease providing nearly all abortion care, Pls.' Second Mot. for TRO at 3, ECF No. 56. *Cf. City of Austin*, 943 F.3d at 1001 (noting that *Ex Parte Young* applied where Attorney General sent plaintiff letters threatening to enforce a statute and thus constrained plaintiff's conduct).

## II. PLAINTIFFS' PATIENTS WILL SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION.

Plaintiffs' patients will suffer severe and irreparable harm in the absence of a preliminary injunction. The Executive Orders violate their constitutional right to end a pregnancy. It is well settled that, where a plaintiff establishes a constitutional violation, no further showing of irreparable injury is necessary. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012); *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. Unit B Nov. 1981). Moreover, the Executive Orders expose Providers' patients to increased health and safety risks, *supra* pp. 4–5, and cause them to suffer physical discomfort, emotional distress, and loss of privacy, *supra* p. 5, as a consequence of having to continue unintended pregnancies. This "disruption or denial of . . . patients' health care cannot

be undone after a trial on the merits." *Planned Parenthood of Kan. & Mid-Mo. v. Andersen*, 882 F.3d 1205, 1236 (10th Cir. 2018) (internal quotation marks omitted), *cert. denied sub nom. Andersen v. Planned Parenthood of Kan. & Mid-Mo.*, 139 S. Ct. 638 (Mem.) (2018); *accord Planned Parenthood of Ariz., Inc. v. Humble*, 753 F.3d 905, 911 (9th Cir. 2014); *Planned Parenthood of Wis., Inc. v. Van Hollen*, 738 F.3d 786, 796 (7th Cir. 2013).

### III. THE BALANCE OF HARMS AND PUBLIC INTEREST SUPPORT PRELIMINARY INJUNCTIVE RELIEF.

As explained above, Providers' patients will continue to experience severe and irreparable harm in the absence of a preliminary injunction. *Supra* pp. 3–9, 19–23. Defendants, on the other hand, will suffer no harm from such an injunction because the Executive Orders' application to abortion fails to actually serve Defendants' asserted public health interests. *Supra* pp. 9–12, 19–22. Thus, the balance of harms weighs in favor of a preliminary injunction. Likewise, the Fifth Circuit has made clear that "the grant of an injunction will not disserve the public interest" where, as here, the "injunction is designed to avoid constitutional deprivations." *Jackson Women's Health Org.*, 940 F. Supp. 2d at 424; *see also Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 280 (5th Cir. 1996). Finally, preserving abortion access will actually aid the response to COVID-19. *See supra* pp. 9–12.

## CONCLUSION

For the foregoing reasons and those set forth in prior filings designated by Plaintiffs, this Court should grant Plaintiffs' motion for a preliminary injunction.

Dated: April 18, 2020

Respectfully submitted,

/s/ Patrick J. O'Connell
Patrick J. O'Connell
Texas Bar No. 15179900
Law Offices of Patrick J. O'Connell PLLC
5926 Balcones Dr., Ste. 220
Austin, Texas 78731
(512) 852-5918
pat@pjofca.com

*Attorney for All Plaintiffs*

Julie Murray*
Hannah Swanson*
PLANNED   PARENTHOOD   FEDERATION
OF AMERICA
1110 Vermont Ave., NW Ste. 300
Washington, D.C. 20005
(202) 973-4800
julie.murray@ppfa.org
hannah.swanson@ppfa.org

Jennifer Sandman*
PLANNED   PARENTHOOD   FEDERATION
OF AMERICA
123 William Street
New York, NY 10038
(212) 541-7800
jennifer.sandman@ppfa.org

*Attorneys for Plaintiffs Planned Parenthood
Center for Choice, Planned Parenthood of
Greater Texas Surgical Health Services, and
Planned Parenthood South Texas Surgical
Center*

Molly Duane*
Rabia Muqaddam*
Francesca Cocuzza*
CENTER FOR REPRODUCTIVE RIGHTS
199 Water St., 22nd Floor
New York, NY 10038
(917) 637-3631

mduane@reprorights.org
rmuqaddam@reprorights.org
fcocuzza@reprorights.org

*Attorneys for Plaintiffs Southwestern
Women's Surgery Center, Brookside
Women's Medical Center PA d/b/a
Brookside Women's Health Center and
Austin Women's Health Center, Robin
Wallace, M.D., Alamo City Surgery Center
PLLC d/b/a Alamo Women's Reproductive
Services, and Houston Women's
Reproductive Services*

Stephanie Toti
Rupali Sharma*
Sneha Shah*
LAWYERING PROJECT
25 Broadway, Fl. 9
New York, NY 10004
(646) 490-1083
stoti@lawyeringproject.org
rsharma@lawyeringproject.org
sshah@lawyeringproject.org

*Attorneys for Plaintiffs Whole Woman's
Health and Whole Woman's Health Alliance*

Anjali Salvador, TX Bar No. 24110324*
Andre Segura, TX Bar No. 24107112*
ACLU FOUNDATION OF TEXAS, INC.
5225 Katy Freeway, Suite 350
Houston, TX 77007
Tel. (713) 942-8146
Fax: (713) 942-8966
asalvador@aclutx.org
asegura@aclutx.org

Brigitte Amiri*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel. (212) 549-2600
bamiri@aclu.org

27

*Attorneys for Plaintiff Houston Women's Center*

*\*Admitted Pro Hac Vice*

## CERTIFICATE OF SERVICE

I certify that on this 18th day of April, 2020, I filed a copy of the foregoing with this Court's

CM/ECF system, which will serve a copy on the following individuals:

Heather Gebelin Hacker
Andrew Bowman Stephens
Benjamin S. Walton
Office of the Attorney General of Texas
209 W. 14th Street
7th Floor
Austin, TX 78701
(512) 836-2540
(512) 474-2697 (fax)
heather.hacker@oag.texas.gov
andrew.stephens@oag.texas.gov
benjamin.walton@oag.texas.gov

John J. Butrus, Jr.
Dallas County District Attorney's Office
133 N. Riverfront Blvd LB 19
Dallas, TX 75207
(214) 653-3691
(214) 653-2899 (fax)
john.butrus@dallascounty.org

Justin C. Pfeiffer
Fort Bend County Attorney's Office
401 Jackson Street
Third Floor
Richmond, TX 77469
(281) 341-4555
(281) 341-4557 (fax)
justin.pfeiffer@fortbendcountytx.gov

Ruben Gabriel Duarte
El Paso County Attorney's Office
500 E. San Antonio - Rm 503
El Paso, TX 79901
(915) 546-2083
rduarte@epcounty.com

Adam Arthur Biggs
Special Litigation Counsel
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, TX 78711-2548
(512) 463-2120
(512) 320-0667 (fax)
adam.biggs@oag.texas.gov

David S. Lill
Lill Firm, P.C.
4407 Bee Caves Road
Suite 111 Building 1
Austin, TX 78746
(512) 330-0252
(844) 402-9814 (fax)
david@lillfirm.com

Elizabeth Murrill
Joseph Scott St. John
Louisiana Dept. of Justice
1885 North Third Street
Baton Rouge, LA 70804
225-456-7544
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov

/s/ *Julie Murray*
Julie Murray